United States Court of Appeals,

Fifth Circuit.

No. 91–8593.

TEXAS CATASTROPHE PROPERTY INSURANCE ASSOCIATION, et al., Plaintiffs-Appellees,

v.

Dan MORALES, Individually and in his official capacity as Attorney General of the State of Texas, Defendant–Appellant.

Oct. 28, 1992.

Appeal from the United States District Court for the Western District of Texas.

Before JOLLY and DUHÉ, Circuit Judges, and PARKER,[1] District Judge.

DUHÉ, Circuit Judge:

This appeal requires us to decide whether the district court abused its discretion when it issued a preliminary injunction preventing the Attorney General for the State of Texas from fulfilling his statutory duty to provide the sole legal representation for the Texas Catastrophe Property Insurance Association (CATPOOL), an entity comprised of private insurers that writes insurance policies covering risks as prescribed by the State of Texas. We find no abuse of discretion and accordingly affirm the preliminary injunction.

I.

CATPOOL was created by the Texas Legislature in 1971. 1971 Tex.Gen.Laws 843 (codified as amended at Tex.Ins.Code Ann. art. 21.49 (West 1981 & Supp.1992)). CATPOOL is a sort of assigned risk pool; all of the property insurers in Texas are required to belong

---

[1]Chief Judge of the Eastern District of Texas, sitting by designation.

to the pool as a condition of doing business in the state. Tex.Ins.Code Ann. art. 21.49 § 4(a) (West 1981). The pool must write "windstorm, hail and fire insurance" in designated parts of the state. *Id.* § 1. CATPOOL writes its own policies and pays its own claims, which are funded first from premiums, then from assessments against the member companies. In short, CATPOOL is directly funded by the private monies of private citizens and corporations—not by the funds of the public treasury. If the losses exceed a certain amount, the companies that fund CATPOOL are entitled to limited tax credits from the state. The parties do not dispute these facts.

According to the statute that created it, CATPOOL is run according to a plan of operation adopted in a rulemaking procedure by the State Board of Insurance with the advice of the CATPOOL board of directors. *Id.* § 5(c) (West Supp.1992). Representatives of the member insurance companies comprise a majority of the board of directors. The directors are "responsible and accountable" to the State Insurance Board. *Id.* § 5(g). Since its creation, CATPOOL has employed its own private legal counsel.

A recent amendment to the statute, however, requires CATPOOL to rely exclusively on the Texas Attorney General for legal representation, and the constitutionality of that amendment is the subject of this suit. By an act effective September 1, 1991, the Legislature proclaimed: "The association [CATPOOL] is a state agency for purposes of employing or authorizing legal representation and shall be represented by the attorney general in the manner provided by general law for representation of any other

state agency by the attorney general." 1991 Tex.Gen.Laws 1077 (codified at Tex.Ins.Code Ann. art. 21.49, § 12A (West Supp.1992)).

On September 3, CATPOOL and some of its member insurance companies filed this action under 42 U.S.C. § 1983, claiming that the amendment requiring CATPOOL to be represented by the attorney general deprived it of rights guaranteed by the federal constitution. In particular, CATPOOL prayed the district court to enjoin enforcement of the amendment on the ground that the new law stripped the association of its constitutional right to counsel. After a hearing, the district court agreed with CATPOOL and issued the preliminary injunction. The attorney general appeals.

## II.

There are four requirements for a preliminary injunction: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) that the injunction will not disserve the public interest." *Apple Barrel Prods. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984). These four requisites are mixed questions of law and fact. Although we broadly review the district court's legal conclusions, its findings of fact will not be disturbed unless they are clearly erroneous. We will not reverse unless the appellant shows that the district court abused its discretion. *Id.*

The attorney general has not disputed the district court's holdings on the issues of irreparable harm, the public interest, and relative lack of harm to the attorney general. Having reviewed

the district court's opinion, we believe that the court soundly exercised its discretion when it held for the Plaintiffs on those three issues, and we focus the remainder of our opinion on the question that the parties have asked us to resolve:  whether there is a substantial likelihood that the Plaintiffs will prevail on the merits of their claim.

## III.

The central question in this § 1983 suit is whether any federally guaranteed right of CATPOOL has been violated.  The attorney general, apparently not disputing that a right to retained counsel in civil matters generally exists, argues that CATPOOL is a state agency and therefore has no constitutional rights to assert against the state which created it, and which could destroy it if the Legislature decided to do so.  We conclude that there is a constitutionally guaranteed right to retain hired counsel in civil matters, that the right in this case is grounded in the Fourteenth Amendment due process clause, and that CATPOOL holds such a right.

## A.

Nowhere does the Constitution specifically say that a state cannot deprive persons of counsel in civil trials,[2] but a number of cases address the question.  *See, e.g., McCuin v. Texas Power & Light Co.,* 714 F.2d 1255, 1262–65 (5th Cir.1983);  *Mosley v. St. Louis Sw. Ry.,* 634 F.2d 942, 945–46 (5th Cir. Unit A Jan. 1981), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 407 (1981); *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1117 (5th

---

[2]*Cf.* U.S. Const. amend. VI ("In all *criminal prosecutions,* the accused shall enjoy the right ... to have the assistance of counsel for his defence.")  (emphasis added).

Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *accord Gray v. New England Tel. & Tel. Co.,* 792 F.2d 251, 257 (1st Cir.1986). This Court has construed Supreme Court precedent to find "a constitutional right to retain hired counsel." *Id.* at 1118 (construing *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932)). *But see Kentucky W. Va. Gas Co. v. Pennsylvania Public Utility Comm'n,* 837 F.2d 600, 618 (3d Cir.) ("The Supreme Court has not recognized a constitutional right to counsel in a civil case...."), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). As the Supreme Court stated,

> If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

*Powell,* 287 U.S. at 69, 53 S.Ct. at 64. The *Powell* Court, which directly reviewed a state conviction, was speaking of the Fourteenth Amendment due process clause,[3] while *Potashnick* applied the Fifth Amendment due process clause to a deprivation caused by a federal court. *Potashnick,* 609 F.2d at 1117. Because the deprivation in the instant case is caused by a state, the Fourteenth Amendment due process clause is the appropriate amendment on which to base this due process claim.[4]

The right to counsel in civil matters "includes the right to choose the lawyer who will provide that representation." *McCuin,* 714 F.2d at 1257. While this right is "one of constitutional

---

[3]*Powell,* 287 U.S. at 50, 53 S.Ct. at 57.

[4]The district court based its decision on the Fifth Amendment, but that error is harmless.

dimensions and should be freely exercised without impingement,"[5] the right is not absolute. *McCuin,* 714 F.2d at 1262. If the state can show "compelling reasons," then a party's right to choose its own counsel may be overridden. We can find no intimation in the record of the case at bar, though, that the State of Texas has met the extraordinary burden of showing that it is compelled to deprive CATPOOL its fundamental right[6] to choose its own counsel.

The district court specifically found that the reasons proffered by the attorney general in support of this statute are not compelling in the constitutional sense. Before this Court, the attorney general has argued that the state's interests are "important,"[7] but for purposes of constitutional analysis, "important" reasons do not suffice where the Constitution requires "compelling" ones. We do not mean to say that the attorney general cannot, as a matter of law, satisfy this burden when it comes time for him to oppose a permanent injunction. For the present, we are only concerned with a substantial likelihood of success on the merits, and we do not believe that the district court abused its discretion when it found that CATPOOL is likely to prevail on this point.

### B.

Having concluded that there is a constitutional right to retained counsel in civil cases, and that this right may not be impinged without compelling reasons, we must ask whether CATPOOL

---

[5]*Mosley,* 634 F.2d at 946.

[6]*McCuin,* 714 F.2d at 1262.

[7]*E.g.,* Appellant's Br. at 23-24.

holds this right.  A state agency has no constitutional rights to assert against the state of which it is a part.  *Board of Levee Comm'rs of the Orleans Levee Board v. Huls,* 852 F.2d 140, 143 (5th Cir.1988).  The attorney general has founded much of his case upon this principle, but the principle cannot uphold the elaborate argument that he has tried to build upon it.

The principle that a state agency has no constitutional rights to assert against the state that created it is predicated on the concept that state agencies generally, if not always, are parts of the state itself.  The parties have expended many pages on the question of whether CATPOOL is a "state agency."  The more appropriate question is whether CATPOOL is part of the state.  For if CATPOOL be a part of the state, it cannot make any constitutional claims against the state;  the agency and the state would be one and the same thing.

State government, as it may be conceived for our present purposes, is a great compendium of powers.  It may make laws governing a vast array of activities, as is evidenced by the shelves filled with state statutes on myriad subjects.  Sometimes, for the sake of convenience, a state will squeeze off some of this power to a political subdivision that it has created, such as a municipality or a levee board.  Then that smaller state entity—that

"political subdivision"[8] or "auxiliar[y]"[9] or "arm[ ]"[10] of the state—takes charge of the function assigned to it and exercises the power delegated to it.

Thus a levee board may expropriate land and develop a levee system, using the power of expropriation and development that was delegated by the state when the state created the levee board. The expropriated land belongs to the state because the levee board that took it is part of the state. *Huls,* 852 F.2d at 143. If the state then decides that the land should no longer be in the charge of the levee board but should be transferred to the park service, no constitutional claim arises. It is the state's land, and the state can move the land from one part of itself to another. A federal court would not entertain a suit by the levee board against the state, for "[t]o allow [such a] suit would be to allow the state to sue the state over state land." *Id.*

Similarly, a private company that holds rights granted by a state may assert a contract clause[11] claim if the state impinges upon that contract. If the same company conveys its rights to a municipality, however, and the state then impinges on the municipality's rights, no federal court will entertain the suit. *City of Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed.

---

[8]*City of Trenton v. New Jersey,* 262 U.S. 182, 185, 43 S.Ct. 534, 536, 67 L.Ed. 937 (1923).

[9]*Town of Mount Pleasant v. Beckwith,* 100 U.S. 514, 524, 25 L.Ed. 699 (1880).

[10]*City of Pawhuska v. Pawhuska Oil & Gas Co.,* 250 U.S. 394, 398, 39 S.Ct. 526, 528, 63 L.Ed. 1054 (1919).

[11]U.S. Const. art. I, § 10.

937 (1923). As Chief Justice Marshall first stated the principle that a part of the state may not sue the state under the federal constitution:

> If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds ... be public property, or if the state ..., as a government, be alone interested in its transactions, the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.

*Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 629-30, 4 L.Ed. 629 (1819).

The relevant inquiry, then, is one of identity: the material question is whether CATPOOL is a part of the state. The district court held that CATPOOL is not a part of the state, and we agree. If CATPOOL makes a profit, that money does not go to the state. Although some profits are used to purchase reinsurance, the member companies may receive distributions from profits. Tex.Ins.Code Ann. art. 21.49, § 5(b) (West Supp.1992). If losses exceed premiums, the member companies are assessed, not the public treasury. *See id.* When CATPOOL loses, the bank accounts of its members are depleted, not the public treasury. The fact that losses are subsidized in part through the allowance of tax credits does not eliminate the risk to the private entities' capital. When CATPOOL wins, the bank accounts of its members may be augmented, not the public treasury. Hypothetically, if CATPOOL's lawyer is incompetent or disloyal, the members, who are private companies, lose money, not the public treasury.

That the state holds, and exercises, the coercive power to force private insurers doing business in Texas to cover certain

risks[12] does not mean that the money coming out of the companies' bank accounts is state money. It is private money directed to pay private claims. Indeed, the amount of money paid on individual claims depends on its attorneys' successfully advancing their positions. The act creating CATPOOL is not "a grant of political power," as in the case of a municipality or other political subdivision; CATPOOL is not "employed in the administration of the government";[13] and the funds that will be used if counsel is incompetent or disloyal come from the accounts of private companies, where that money could remain if it were protected by counsel. In short, the State of Texas is not alone interested in the assets of CATPOOL. *See Dartmouth College,* 17 U.S. (4 Wheat.) at 629–30. Rather, the member companies are vitally interested in protecting their private monies, and the State of Texas cannot deprive those companies of the rights guaranteed them by the Constitution of the United States to protect their private property.

We hasten to recognize that a state has extremely broad powers to legislate for the welfare of those in the state. The State of Texas indeed has the power to create a state agency that is truly a part of the state—like the State Insurance Board—and fund that

---

[12]This power is not disputed in this suit, and we assume that the state does hold such a power for purposes of this decision. We express no opinion on the validity of such a power.

[13]The attorney general argues that CATPOOL "serves as an integral part of the State [Insurance] Board's administrative process for claims." Appellant's Reply Br. at 6. Administration and processing of claims, even when done pursuant to the State Insurance Board's process, hardly makes this an agency involved "in the administration of the government."

agency by burdensome taxes against insurers doing business in Texas. It could require that agency to rely solely on the services of the attorney general. Because private money is at risk through CATPOOL, the legislature has not created such an agency in CATPOOL. The state can deprive itself of any constitutional rights, as it deems wise, but it cannot prevent private insurers from protecting their own money with retained counsel of their choice.

We conclude that CATPOOL holds the right to counsel, as explained above. *See supra* section III.A. The recent amendment to the CATPOOL statute has deprived CATPOOL and its member insurers of that right, and the district court was correct to hold that the Plaintiffs have a substantial likelihood of success on the merits.

IV.

The attorney general has also challenged the standing of the Plaintiffs. Article III of the Constitution requires a plaintiff

> to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). As should be apparent from the preceding discussion,[14] CATPOOL and its member insurers stand to lose a constitutionally guaranteed right if section 12A is enforced. If the adjudicating court issues the injunction that the Plaintiffs

---

[14]*See supra* Part III.

seek, the State of Texas will be unable to enforce the new amendment and the Plaintiffs' injury will be relieved. The Plaintiffs have shown standing.

We are puzzled by the attorney general's argument that CATPOOL itself (as distinct from its member companies) has no standing because it did not adequately comply with the Texas Open Meetings Act. *See* Tex.Ins.Code Ann. art. 21.49, § 5(k) (West Supp.1992) (requiring notice of meetings to be given according to Tex.Rev.Civ.Stat.Ann. art. 6252–17 (West Supp.1992)). Standing is determined according to the criteria set out in the previous paragraph, and CATPOOL has met those standards. The attorney general may have some cause of action under state law if he is correct in arguing that CATPOOL inadequately complied with its notice obligations, but we discern no standing issue.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.


ROBERT M. PARKER, District Judge, dissenting:

I agree with the majority opinion that the central question in this Section 1983 suit is whether CATPOOL is a part of the State of Texas, because a part of a state cannot assert constitutional rights against that state.[1] But beyond this point, I must part

---

[1] It is fundamental that state entities and political subdivisions have no due process or other rights to sue the state creating and sustaining them. *See generally Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *City of Trenton v. State of New Jersey,* 262

from my colleagues.

The majority opinion attempts to distinguish CATPOOL from the agency auxiliaries to which the majority recognizes a state may delegate powers and functions, on the ground that CATPOOL's member companies risk the loss of their own, private funds, and enjoy the possibility of private profit, or "augmentation." At oral argument, Appellees characterized CATPOOL as a group of private insurers protecting their private pocketbooks. I write in dissent because I do not agree that the money at risk is the "private" money of the CATPOOL member companies, and because the undisputed facts before the Court establish that CATPOOL is indeed a part of the State of Texas. Because CATPOOL's member companies cannot satisfy their burden with respect to the issuance of a preliminary injunction in this case, I would hold that the district court judge erred in granting them the injunction at issue. *See Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974) (preliminary injunction can be granted only when the district court has found "a *substantial likelihood* that plaintiff will prevail on the merits.") (emphasis added).

## I. CATPOOL: State Entity

The majority opinion recognizes that the Texas Legislature could create a public insurance entity that is a part of the State, fund it by taxing insurers, and require it to rely solely on the services of the Attorney General. The Texas Legislature has done just that in clear and unambiguous language in the Catastrophic

U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *Board of Levee Commissioners of the Orleans Levee Board v. Huls,* 852 F.2d 140, 143 (5th Cir.1988).

Property Insurance Pool statute. CATPOOL is a creature of state statute. *Rowden v. Texas Catastrophe Prop. Ins. Ass'n,* 677 S.W.2d 83, 90 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). The CATPOOL legislation indicates that CATPOOL is indeed "a part of" the State of Texas. As the majority notes: CATPOOL was created by the Texas Legislature to provide windstorm and hail insurance to homes and businesses in the fourteen Texas counties along the Gulf Coast; the Texas Legislature created CATPOOL in 1971 to provide this windstorm and hail insurance. Prior to the emergence of the CATPOOL legislation, these areas of Texas were not insurable; private insurers in the pre-CATPOOL market were disinclined to insure such high-hurricane risk property. In short: the Legislature intended CATPOOL to promote the public interest by protecting the economic security of Texas citizens along the coast (by insuring their homes and businesses), and by promoting economic growth and development along the Texas coast. *See generally Rowden, id.*

CATPOOL is funded through the coercive power of the State of Texas. Insurance companies doing business in Texas are compelled to be members of CATPOOL in order to be licensed by the State to sell insurance. Tex.Ins.Code Ann. art. 21.49, § 4(a) (West 1989). CATPOOL's public purpose is evident from its character as an auxiliary of the State Board of Insurance. As the majority appreciates:

> Sometimes, for the sake of convenience, a state will squeeze off some of [its great compendium of powers] to a political subdivision that it has created, such as a municipality or a levee board. Then that smaller state entity—that "political subdivision" or "auxiliar[y]"[ ] or "arm[ ]"[ ] of the state—takes charge of the function assigned to it and

exercises the power delegated to it.

But the majority fails to recognize that, because CATPOOL operates as a necessary arm of the State Board of Insurance—itself an auxiliary of the State of Texas—CATPOOL is a State entity; that is, CATPOOL is "a *part of the State* " for purposes of constitutional analysis.

The circumstances of this case *do* satisfy the explanatory hypothetical posited by the majority. If the State of Texas decides, as it has, that the funds assessed against CATPOOL's member companies should be assessed by way of the State Board of Insurance-controlled CATPOOL scheme—as opposed to an arguably less efficient scheme operated through the State Board of Insurance, proper—no constitutional claim arises. It is the State's money—obtained by force of the State's coercive power—and the State can move the money from one part of itself to another (*i.e.,* from the State Board of Insurance, which sets the assessments, to the State Board of Insurance-controlled CATPOOL). Such an administrative decision is for the State to make. As a matter of fundamental constitutional principle (federalism), a federal court should avoid wedging itself into such decisions.

### The CATPOOL Legislation

The Texas Legislature, in creating CATPOOL, granted political power to this entity of its own creation. In essence, CATPOOL is a legislatively created, civil institution to be employed in the administration of Texas government. It is clear to me that Texas' CATPOOL scheme falls on the *state* side of the federalism markings left by Chief Justice Marshall in 1819. *See Trustees of Dartmouth*

*College v. Woodward,* 17 U.S. (4 Wheat.) 518, 629–630, 4 L.Ed. 624 (1819) ("*If the act of incorporation be a grant of political power, if it create a civil institution, to be employed in the administration of the government,* or if the funds ... be public property, ... the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.").

In addition to setting the assessments imposed involuntarily upon CATPOOL's member companies, the State Board of Insurance sets insurance premium rates. Wind and hailstorm losses and expenses incurred by CATPOOL are *primarily* covered by dollars collected through the State Board of Insurance-set premiums *paid by the insured persons of Texas.* The district court found that the maximum amount of premiums collected during a single year by CATPOOL is $21 million. But, as the district court found yet failed to appreciate: any time premiums exceed losses in a given year, those excess dollars are used to purchase reinsurance to cover loss exposure for possible future-year losses in excess of premiums. If ever such losses and expenses exceed CATPOOL's premium and reinsurance funds, the CATPOOL member companies are assessed so that CATPOOL can cover the losses and expenses under such circumstances. The companies are assessed in amounts proportionate to the amount of business they respectively wrote during the previous year.

The State Board of Insurance has complete authority to adopt, revise and amend CATPOOL's plan of operation, and CATPOOL's Board

of Directors is responsible and accountable to the State Board of Insurance. Tex.Ins.Code Ann. art. 21.49 §§ 4 and 5 (Vernon Supp.1992). Indeed, CATPOOL's plan of operation (*i.e.,* its by-laws) must be adopted by the State Board as an *agency rule.* Tex.Ins.Code Ann. art. 21.49, § 5(c) (Vernon Supp.1992). Thus, CATPOOL is completely controlled by the State Board of Insurance, *not* simply regulated by it.[2]

CATPOOL performs administrative functions; CATPOOL serves as an integral part of the State Board's administrative process for claims. For example, the CATPOOL Act provides that claims are first determined by CATPOOL, whose decisions, considered "agency order[s]," are appealable to the State Board. Tex.Ins.Code Ann. art. 21.49, § 9 (Vernon Supp.1992). *Texas Catastrophe Prop. Ins. Ass'n v. Miller,* 625 S.W.2d 343, 346 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ dism'd); *see also Rowden v. Texas Catastrophe Prop. Ins. Ass'n,* 677 S.W.2d 83, 89 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). Functions like those exercised by CATPOOL are *delegated* by the Texas Legislature to state administrative bodies to further public purposes; they are not granted to private entities representing private interests. *Beacon National Insurance Co. v. State Board of Insurance,* 582 S.W.2d 616, 618–619 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). Indeed, the Texas Supreme Court has construed the administrative process involving

---

[2]In contrast, a state-regulated private corporation's Board of Directors is responsible to the corporation's private shareholders, not to the State. Accordingly, a private corporation's primary duty is private-interested, not public-interested: the private corporation's primary task is to earn private profit for its shareholders (within the bounds of public-interested regulations).

the State Board and its auxiliary, CATPOOL, as one "administrative body." *Texas Catastrophe Prop. Ins. Ass'n v. Council of Co-Owners of Saida II Towers Condominium Ass'n, et al.,* 706 S.W.2d 644, 645–646 (Tex.1986).

Other provisions of the CATPOOL Act indicate that CATPOOL is a state entity. First, CATPOOL is explicitly subject to the Texas Open Meetings Act, which Act applies only to governmental bodies. Tex.Ins.Code Ann. art. 21.49, § 5(k) (Vernon Supp.1992). Tex.Rev.Civ.Stat.Ann. art. 6252–17, § 1(c) (Vernon Supp.1992). No private entities are subject to the Texas Open Meetings Act, whose purpose in fact is to "enable public access to and to increase public knowledge of government decisionmaking." *City of San Antonio v. Fourth Court of Appeals,* 820 S.W.2d 762, 765 (Tex.1991).

The Act also provides CATPOOL immunity from liability in some circumstances. Basically, CATPOOL enjoys immunity for property inspections and statements made at administrative hearings. Tex.Ins.Code Ann. art. 21.49, § 10 (West 1989). Immunity from liability is an attribute of a sovereign. *See e.g., Stout v. Grand Prairie Independent School District,* 733 S.W.2d 290, 297 (Tex.App.—Dallas 1987, writ ref'd n.r.e.).[3]

---

[3]Of course, the Legislature may *waive* sovereign immunity whenever it chooses. And the Texas Legislature did just that in September, 1991, relative to one aspect of CATPOOL's sovereign immunity. Until September, 1991, CATPOOL, unlike private insurers, was immune to "bad faith" lawsuits under Article 21.21 of the Texas Insurance Code. *See Leisure Services, Inc. v. Texas Catastrophe Property Insurance Association,* 712 S.W.2d 266, 267–268 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Unhappy with CATPOOL's treatment of insureds, the Legislature amended the Act to apply Article 21.21 to CATPOOL. The fact emphasized by the majority, that "[s]ince its creation, CATPOOL has employed its own private legal counsel," is one properly understood in the light of this sovereign power of waiver. (This counsel-waiver

Finally, the Texas Legislature has specified, in the statutory amendment at the center of this case, that CATPOOL is a "state agency for purposes of employing or authorizing legal representation and shall be represented by the Attorney General in the manner provided by general law for representation of any other state agency by the Attorney General."  Tex.Ins.Code Ann. art. 21.49, § 12A (Vernon Supp.1992).

## II. CATPOOL Funds, Private and Public Interests:  The Proper Perspective

The majority, like the district court, misapprehends the CATPOOL scheme so as to imagine due process-violative takings from private pocketbooks when such deprivation is not in fact happening.  This is where the majority, like the district court before it, appears to have lost its way.

True, CATPOOL is funded in part through State-coerced assessments against all Texas insurance companies.[4]  Texas courts have held that similar assessments amount to State taxes, and accordingly, have upheld them—*i.e.,* because they are "imposed upon and extracted from producers by governmental authority *for a public purpose.*"  *Conlen Grain and Mercantile, Inc. v. Texas Grain Sorghum Producers Board,* 519 S.W.2d 620, 623 (Tex.1975) (emphasis added).  *See also Friedman v. American Surety Co. of New York,* 137 Tex. 149, 151 S.W.2d 570, 577 (1941).  It is, then, irrelevant whether CATPOOL receives money from the State Treasury or directly from

fact is also, I think, properly understood as partially a pragmatic product of the State's fiscal concerns.)

[4]The other, more fundamental part of CATPOOL's funds comes by way of the premiums set by the State Board of Insurance and paid by the insured persons of Texas.

private sources conscripted for a special public purpose. Governmental funds always come from private sources. Ultimately, CATPOOL's funds are *State funds,* because they are *raised through the State's coercive power for public purposes.* Thus, in this respect too, Texas' CATPOOL scheme fits within Chief Justice Marshall's *Dartmouth College* paradigm. *See Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 629-630, 4 L.Ed. 629 (1819) ("If the act of incorporation be a grant of political power, if it create a civil institution, to be employed in the administration of the government, *or if the funds ... be public property,* ... the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.").

Moreover, while it is possible that CATPOOL's losses in any catastrophe year might exceed the then current amount of premiums-derived money in CATPOOL's coffer—so that the members will have to pay at once the difference—the private pocketbooks of the CATPOOL member companies are ultimately protected in various ways. First, *excess* money from year to year, derived from the members' selling of insurance premiums, is *invested* by CATPOOL; CATPOOL uses such profits to purchase *reinsurance—i.e.,* to cover the costs associated with the expected major wind and hailstorm catastrophes of the future. Second, there is a scheme of tax credits in place to compensate companies paying any "excess" (damage claim) assessments in any year (*i.e.,* when the reinsurance money in any "catastrophe year" is not then sufficient to cover the costs of the

catastrophe).

It is, finally, important to realize the following. The insurance companies comprising CATPOOL's membership are not *forced* to do business in Texas. They *choose* to operate their businesses in the Texas insurance market. Membership in CATPOOL, and all that such membership entails, is simply a businessperson's calculated cost or condition of operating an insurance business in Texas. If the State Board of Insurance failed to set premiums at a rate affording insurance companies the ability to operate at a profit—*i.e.,* at a rate overcoming the business cost associated with potential CATPOOL assessments—these companies would soon disappear from the Texas landscape.

In sum: the State of Texas has a substantial interest in making sure CATPOOL's member companies are not assessed so often or to such an extent that they lose money. Texas protects this interest primarily through her insurance-specialist alter ego, the State Board of Insurance—which sets the rates of the insurance premiums: (1) CATPOOL's member companies sell, and (2) comprising the primary source of funds to which State Board of Insurance-auxiliary, CATPOOL, turns in order to cover losses and expenses associated with wind and hailstorm catastrophes along the Texas Gulf Coast. Texas supplements the protection of her interest in attracting and accommodating private insurance companies through a tax credit scheme, which scheme ameliorates the impact of any assessments CATPOOL must make against its members.

The majority, like the district court, focuses (1) on the fact that CATPOOL currently carries but $137 million worth of

reinsurance (while an "average CAT. 4" hurricane hitting the Texas Coast would evidently generate $1 billion worth of damage claims); and (2) on the fact that a CATPOOL member company can only credit 20% of a loss *per tax year* under the CATPOOL tax credit scheme. In so circumscribing its vision, the majority, like the district court, freezes aspects of the CATPOOL funding scheme in time and out of context so as to misconstrue the CATPOOL funding scheme's true, holistic nature.

Additionally, to the extent the private CATPOOL-member companies feel the need to employ their own counsel to protect their peculiar interests within the administrative scheme created by the Texas Legislature, they may do so. The CATPOOL Act itself recognizes this through its authorization that: (1) "any affected insurer who may be aggrieved by any act, ruling or decision of the Association [CATPOOL] ... [to] appeal to the commissioner [of Insurance]," and (2) any "person aggrieved by any order or decision of the commissioner" to appeal to a District Court in Travis County, Texas....".[5]

### III. Conclusion

CATPOOL would have no existence and no funds if it were not for the State's coercive power. And the private interests implicated by the CATPOOL legislation appear insignificant in comparison to the enormous public interests at stake. The Texas Legislature operated within its authority when it amended the CATPOOL statute so as to explicitly designate the Attorney General of Texas as CATPOOL's representative. Because I find the district

---

[5]Tex.Ins.Code Ann. art. 21.49 § 9 (Vernon Supp.1992).

court's preliminary injunction analysis clearly erroneous—in terms of its evaluation of the essential nature of CATPOOL—and offensive to our country's constitutional scheme of federalism, I would reverse.

I respectfully dissent.