**FLORIDA RESIDENTIAL PROPERTY AND CASUALTY JOINT UNDERWRITING ASSOCIATION, Plaintiff**

v.

**UNITED STATES of America, Defendant.**

**No. 4:00cv351/RV.**

United States District Court,
N.D. Florida,
Tallahassee Division.

Feb. 7, 2002.

Barry Richard, Fred F. Harris, Jr., Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Tallahassee, FL, for Plaintiff.

Patrick Michael Patterson, Emmanuel, Sheppard & Condon, Pensacola, FL, Roy F. Blondeau, U.S. Attorney, Northern District of Florida, Tallahassee, ·FL, Ann Reid, U.S. Dept. of Justice, Washington, DC, Jose Francisco De Leon, U.S. Dept. of Justice Trial Attorneys, Tax Division, Washington, DC, for Defendant.

## ORDER

VINSON, Chief Judge.

Pending are the parties' cross motions for summary judgment (docs. 32, 35).

On November 29, 2001, the Court heard oral argument from the parties on these motions. Present were Fred F. Harris, Jr. and Barry Richard for the plaintiff, and Ann Reid on behalf of the defendant. In this case, plaintiff Florida Residential Property and Casualty Joint Underwriting Association ("JUA") seeks a refund in excess of $172 million for federal income taxes paid for the years 1996 through 1999.[1] The determinative issue in this case is whether the JUA should be deemed "an integral part" of the State of Florida, which would entitle it to be exempt from federal income taxes. Except as noted, the following facts are undisputed.

## I. FACTUAL BACKGROUND

In 1992, after Hurricane Andrew caused severe damage to a large portion of the State of Florida, a special session of the Florida Legislature enacted legislation which established the Florida Residential Property and Casualty Joint Underwriting Association as a temporary measure to address the disruption in the residential insurance market. The Act establishing the JUA is codified at Section 627.351(6), *Florida Statutes* (1997) ("Act").[2] The JUA was created "for equitable apportionment or sharing among insurers of property and casualty insurance covering residential property, for applicants who are in good faith entitled, but are unable, to procure insurance through the voluntary market." § 627.351(6)(a), *Fla. Stat.* (1993).[3]

The JUA holds a Certificate of Authority issued by the Department of Insurance ("DOI") authorizing it to write insurance. Gov't Ex. A at ex. 6. Moreover, the JUA is licensed as an insurance company by the DOI and is subject to the insurance laws and regulations applicable to other insurance companies operating in the State of Florida. The JUA also must adopt premium rates, adhere to underwriting standards, and follow claims adjustment procedures like any private insurance company. It must also file audited financial statements and follow the same accounting principles as private insurance companies. Gov't Ex. A at 11 (citing §§ 624.11, 624.424, 624.316, 624.3161). Nonetheless, the JUA is statutorily subject to intense oversight by the DOI to a degree not required of private insurance companies. *See e.g.*, § 627.351(6)(a), (b), subd. 1, *Fla. Stat.* (1997).

The JUA is operated under the supervision of a thirteen member Board of Governors ("Board"), a majority of whose members are appointed by the Florida Insurance Commissioner ("Commissioner"). In actual practice, the Commissioner has appointed all members of the Board. Furthermore, the Commissioner may disapprove of or remove and replace any Board member at any time for cause.

1. The principal amounts of federal income taxes at issue are: 1996—$10,359,075; 1997—$88,260,806; and 1998—$51,269,316. For 1999, the JUA paid approximately $22,200,000 in federal income tax. However, after this action was filed, the IRS refunded to the JUA the taxes paid for that year, plus accrued interest (an amount in excess of $23 million).

2. Unless otherwise denoted, all cites to section 627.351(6) refer to the 1997 codification. The only amendment made in 1998 to section 627.351 was a minor amendment to para-

graph (e) of subsection (2), which does not appear to affect the JUA's tax-exempt status. In this order, "JUA Ex.—" refers to the exhibits attached to the JUA's motion for summary judgment (doc. 32); and "Gov't Ex.—" refers to the exhibits attached to the United States' appendix to its statement of material facts (doc. 37).

3. All insurers authorized to write subject lines of insurance business in the State of Florida, other than underwriting associations, are required to participate in, and be members of, the JUA, § 627.351(6)(b), subd. 1.

§ 627.351(6)(c), subd. 4, *Fla. Stat.* (1997). The DOI also approves of the Board's agenda before any Board meetings; and DOI representatives have attended Board meetings, had their own nameplates at such meetings, and often sat at the table with the Board members. The Plan of Operation for the JUA is written, approved, and periodically reviewed by the DOI. § 624.351(6)(a), *Fla. Stat.* (1997).

During the tax years in question, the DOI engaged in various activities that suggest almost total control over the JUA, including the following: (1) the DOI's representatives were in daily contact with the JUA; (2) JUA staff and employees attended the DOI's senior management meetings; (3) the DOI loaned its employees to the JUA pursuant to interagency agreements; (4) the DOI issued State of Florida identification badges to JUA employees and Board members, which provided them with access to State facilities and State travel discounts; (5) the DOI established and staffed the JUA's public relations department and required the JUA to obtain prior approval of any press releases; (6) Commissioner Tom Gallagher was personally involved in writing initial servicing carrier agreements for the JUA, and the Commissioner reduced JUA rates and refused to allow insurers to simultaneously be servicing carriers for the JUA and to sit on the JUA's Board of Governors.

The DOI also "depopulated" the JUA pursuant to legislation passed in 1995. The "depopulation" effort is a concerted program to reduce the number of policies required to be issued by the JUA—a goal of putting the JUA out of business. It has successfully reduced the number of JUA policies from a high of about 940,000 to less than 100,000. In furtherance of this depopulation program, weekly meetings were held between then Commissioner (now Senator) Bill Nelson, DOI staff, and JUA senior management. The DOI formulated and proposed the depopulation legislation and initiated the depopulation plans. The DOI's involvement included soliciting insurers to take out policies and assisting in drafting the depopulation notices to JUA policyholders. The DOI also required the JUA to create a brochure on the depopulation program, hire a designated firm to do the work, and to pay the cost of the brochure.[4]

The Government asserts that the JUA is operated as a private insurance company, in part, because its insurance operations are out-sourced.[5] Newman trans. at 39–40, Ex. 11. Moreover, applications for insurance coverage are submitted to the JUA's service companies by insurance agents appointed by the JUA. In addition, the JUA's legal services are provided by private counsel, and the JUA has never been represented by the Attorney General of the State of Florida.[6] The JUA, like

4. The JUA also has offered the testimony of various individuals involved in the DOI and the JUA who testified that the State of Florida controlled the JUA. These individuals included Commissioner Tom Gallagher; Linda Shelley, former Assistant Executive Director of the JUA and former chief of staff of the DOI; Peter J. Mitchell, former chief of staff of the DOI under Commissioner Bill Nelson; and James W. Newman, JUA Executive Director.

5. For the years at issue, the JUA had a contract with Policy Management Systems Corporation ("PMSC") to provide systems administration to the JUA. According to James W.

Newman, the JUA's Executive Director, the JUA's insurance business is essentially done at PMSC. PMSC is a company located in South Carolina that provides a centralized database of policy and claims information for management reports, special projects, and statistical reporting. Newman trans. at 54–56.

6. The JUA claimed deductions for legal fees on its federal corporate income tax returns in the amounts of $45,924; $618,678; and $822,531; for the years 1996, 1997, and 1998, respectively. Newman trans. at exs. 19, 20, 21.

each private insurance company writing residential property insurance with wind or hurricane coverage in Florida, is legally required to enter into a reimbursement contract with, and pay premiums to, Florida's Hurricane Catastrophe Fund ("CAT Fund").[7] Finally, the JUA is not audited by the Office of the Auditor General of the State of Florida, which is required to make annual financial audits of all state agencies; and neither the JUA, its revenues, nor its expenses are included in the budget for the State of Florida. Gov't Ex. A at 13.

Evidence also has been submitted concerning the State of Florida's financial commitment to the JUA. First, the JUA contends that the State of Florida has provided it with general indirect financial support. For example, at the inception of the JUA, the DOI loaned its employees to the JUA, allowed the JUA to operate out of its offices, permitted JUA Board meetings to be held in DOI offices, and set up a line of credit for the JUA. Additionally, JUA employees and Board members were entitled to use State of Florida travel and lodging discounts when traveling on JUA business. The JUA also possessed statutory authority to issue start up assessments to its member insurers, which it did in the amount of $716,000.

Second, the JUA points out that the DOI has been involved in the JUA's attempts to secure financing. In 1995, on behalf of the JUA, the DOI helped secure $1.5 million in financing; and in 1997, the DOI insured a renewal of that financing. Moreover, the DOI provided strategic planning for the JUA's attempts to get financing, in addition to reviewing and approving all documents related to the JUA's financing. The DOI also had Dan Sumner, the DOI's general counsel under Commissioner Nelson, meet with banks, rating agencies, underwriters, and potential investors on behalf of the JUA. The DOI also entered into agreements giving assurances to underwriters on behalf of the JUA, and often was called upon to confirm that it oversaw and was the responsible party for the JUA's obligations. Gallagher depo. at 40–41; Mitchell depo. at 68; Newman depo. at 219–20; Sumner Aff. (JUA Ex. I), § 3.5.2, Dep't of Ins. Agreement (JUA Ex. G).

Third, the JUA argues that the State of Florida has made a financial commitment to it by way of various statutory tax exemptions, surcharges, and assessments. The JUA is statutorily designated as "considered a political subdivision of the state" for state tax purposes and is exempt from Florida's corporate income tax and from Florida's intangible tax for purposes of section 199.183(1). § 627.351(6)(j), *Fla. Stat.* (1997).[8] The JUA also was exempt from Florida's premium tax, and was exempt from municipal taxes during the period for which it was exempt from premium taxes.[9] JUA Ex. K. When it experiences a deficit, the JUA can levy regular assess-

---

7. The CAT Fund acts as a reinsurer for certain losses incurred by such insurers (including the JUA) relating to hurricanes. The IRS recognizes the Florida CAT Fund as an integral part of the State of Florida and it is not subject to federal income taxes.

8. Section 627.351(6)(j) provides:
   The Residential Property and Casualty Joint Underwriting Association is not a state agency, board, or commission. However, for purposes of s. 199.183(1), the Residential Property and Casualty Joint Underwriting Association shall be considered a political subdivision of the state and shall be exempt from the corporate income tax.

9. From its inception until the enactment of Chapter 95–276, *Laws of Florida* (1995), on June 14, 1995, the JUA was exempt from the payment of insurance premium taxes. However, in total, the JUA has paid more than $50 million dollars in taxes and fees to the State of Florida and its agencies for the years from 1993 to 2000. Gov't Exs. H, I, J.

ments on its members, but only after approval by the DOI. § 627.351(6)(g), subd. 1. The JUA may levy an emergency assessment on all individuals and businesses with insured property in Florida, if the deficit is larger than the amount recovered through the regular assessment and such an assessment is verified by the DOI. § 627.351(6)(b), subds. 3, d, *Fla. Stat.* (1997). When the JUA imposes assessments to cover a deficit, statutory market equalization surcharges must be imposed upon JUA policyholders, which provides further revenue to the JUA. § 627.351(6)(c), subd. 10, *Fla. Stat.* (1997). The JUA is prohibited from distributing any profits or retained earnings to its participating insurers. Finally, the DOI must approve any dissolution of the JUA; and, upon dissolution, its remaining assets become the property of the State of Florida and are deposited into Florida's CAT Fund. § 627.351(6)(k), *Fla. Stat.* (1997).[10]

Finally, evidence has been submitted concerning whether the JUA possesses sufficient characteristics to demonstrate that it is an integral part of the State of Florida. The JUA must comply with Florida's Sunshine and public records laws, subject to certain exemptions.[11] Art. 1, § 24(a), (b), *Fla. Const.*; §§ 119.07, 286.011, 627.351(6)(n)1, 2. Additionally, the public has standing to challenge JUA decisions (JUA Ex. N at § 25), and the JUA

has been granted immunity from suit or liability for damages. This immunity includes its "member insurers or its agents or employees," but excludes the normal insurance issues of breach of contract or agreement pertaining to insurance coverage. § 627.351(6)(i). The JUA also has been given immunity from antitrust liability. *See Bankers Ins. Co. v. Florida Residential Prop. & Cas. Joint Underwriting Ass'n,* 137 F.3d 1293 (11th Cir.1998) (JUA Ex. B). Finally, the JUA has tax exempt bonding authority; and like any statutorily created board, association, or entity, it is an authorized depositor with the State Treasurer's Investment Account. §§ 627.351(6)(c)(3); 18.125,(1), *Fla. Stat.*

Although not encompassing the federal tax issue raised in this litigation, in various other contexts the State of Florida and its agencies have determined that the JUA is not part of the State of Florida. In 1993, the Florida Commission on Ethics determined that the Legislature had no regulatory power over the JUA except through the enactment of laws, and the JUA was described as "a non-governmental entity made up of private insurance companies which, under requirements of law, must participate in and be members."[12] Gov't Ex. C at 4–5. The Division of Administrative Hearings of the State of Florida determined that the JUA is not a unit or organization of the executive branch of state

---

**10.** The JUA also is required to establish non-competitive rates, which are designed to provide a disincentive to obtaining JUA policies. § 627.351(6)(d), subd. 2. These disincentives and the depopulation program demonstrate that the JUA is not a competitive market participant. Rather, the JUA is obviously intended to be temporary, and has a business policy designed to shift its customers to other property insurers and go out of business (because property owners will have an available and less expensive alternative).

**11.** The Government argues that the limited applicability of these laws to the JUA does not

make it an integral part of the State of Florida because the JUA enjoys exemptions from these laws that encompass most of its business activities. § 627.351(n), *Fla. Stat.* (1997); Gov't Ex. A at 4.

**12.** In this advisory opinion, the Commission on Ethics was addressing whether a conflict of interest would be created by a State Senator representing an insurance company before the JUA. The Commission determined that there would be no conflict because the JUA was not a "state agency." Gov't Ex. C.

government for purposes of Chapter 287, *Florida Statues* (1995), which sets forth competitive bidding requirements for state agencies. Gov't Ex. D at 16–18. Furthermore, in an opinion dated June 9, 1995, the Florida Attorney General determined that revenues of the JUA are not "state revenues" for purposes of Article VII, section 1(e) of the Florida Constitution. Gov't Ex. A, Ex. 9. The same result was reached by the Supreme Court of Florida in *In re Advisory Opinion to the Governor—State Revenue Cap*, 658 So.2d 77, 81 (Fla.1995) (Gov't Ex. F). Moreover, the State Board of Administration has found that interest rate limitations applicable to "governmental units" did not apply to the JUA's loans on securities. Gov't Ex. E.

## II. DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *see also Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir.1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*,

64 F.3d 590, 594 (11th Cir.1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir.2000); *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir.1983). On the other hand, if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, then the issue of fact is genuine. *See Matsushita Elec. Indus. Co., supra*, 475 U.S. at 586, 106 S.Ct. at 1356. On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the nonmoving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir.1999).

In this case, both sides assert that the evidence in the record is complete and that there are no genuine issues of material fact. It is a case that appears to be ripe for summary judgment. The determinative issue is whether the JUA should be deemed "an integral part of the State of Florida," and thus exempt from federal income taxes for the periods in question.

### B. *Integral Part of the State of Florida*

█ Generally, income earned by an integral part of a state or a political subdivision of a state is not taxable in the absence of a specific statutory authorization to tax that income. Rev. Rul. 87–2, 1987–1 C.B. 18, 1987 WL 383666. In deciding whether an entity is an integral part of a state, the

appropriate factors to be considered include those used by the IRS in Revenue Ruling 57–128, 1957–1, 1957 WL 11279 Cum. Bull. 311, which are as follows:

(i) whether the entity is used for a governmental purpose and performs a governmental function;

(ii) whether the entity performs on behalf of one or more states or political subdivisions;

(iii) whether there are any private interests involved, or whether the state or political subdivision involved has the powers and interests of an owner;

(iv) whether control and supervision of the entity is vested in a public authority;

(v) whether authorization is necessary for the creation or use of the entity; and

(vi) the degree of financial autonomy and the source of the entity's operating expenses.

*See, e.g., Michigan v. United States,* 40 F.3d 817, 826–27 (6th Cir.1994); *Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 918 (2d Cir.1987). In determining whether an entity is an integral part of a particular state in private letter rulings, the IRS has added that:

it is necessary to consider all of the facts and circumstances, including the state's degree of control over the enterprise and the state's financial commitment to the enterprise.

JUA Ex. P at 6; JUA Ex. M at 8. I recognize that this determination ultimately requires consideration of the totality of the circumstances and no one factor dominates. Therefore, in addition to the issues of control and financial commitment, the six factors set forth in Revenue Ruling 57–128 are relevant in evaluating whether the JUA is an integral part of the State of Florida.

After consideration of these six factors, there is little doubt that the JUA bears a much closer resemblance to being an integral part of the state than to being a private insurance company. I summarize these: (1) Providing property insurance to those property owners who are in good faith entitled, but otherwise unable, to obtain insurance serves the governmental purposes of stabilizing the state's economy, serving the needs of a large segment of the public, and facilitating property ownership in the state. (2) The JUA is an entity under the supervision and control of the DOI; and in practice, it is an extension of the DOI itself. Thus, it performs on behalf of the Florida Department of Insurance and the State of Florida. (3) The state's governmental interests clearly predominate over any private interests of the insurance industry, especially since there is no evidence that private insurance companies, which are required by law to participate in the JUA, receive any profit or direct benefit from the JUA's existence. Any profits and retained earnings are required to go to the State of Florida ultimately. The rights of ownership, therefore, inure to the state and not to any private entity. (4) The JUA is overwhelmingly under the supervision and control of the DOI, especially the Insurance Commissioner.[13] (5) The JUA was established by

---

**13.** Several of the JUA's attributes demonstrate that it is controlled by the State of Florida through the DOI. (1) The JUA was created by the Florida Legislature and its activities are overseen by the DOI. (2) The JUA is operated pursuant to a Plan of Operation written and reviewed by the DOI. (3) Its business is conducted by a Board of Governors appointed by the Insurance Commissioner. (4) The DOI has been closely involved in the JUA's programs, including the depopulation program and all of which must be approved by the Insurance Commissioner. (5) The JUA can only be dissolved with the consent of the DOI; and when it is dissolved, all of its remaining

the Florida Legislature in a special session and under emergency conditions to deal with a serious statewide crisis. It is a creation of the state by specific legislative authority, and is plainly intended to exist only as long as there is a property insurance problem. As a temporary entity, its policy is to phase itself out of existence as quickly as possible. (6) Finally, the JUA's funds are collected only through statutory authorization and compulsory membership of private insurance companies. It has no real financial autonomy, and any financial success it may achieve must ultimately inure to the State of Florida. As reflected above, each of these factors weighs in favor of a finding that the JUA is an integral part of the State of Florida, and most of the factors weigh heavily that way.

In addition to these various factors, I also consider the state's financial commitment, a factor the Government believes weighs in favor of its position. The JUA has received a substantial financial commitment from the State of Florida. It has received over $40 million from the State of Florida by way of tax exemptions,[14] and it has received approximately $14 million from statutorily authorized market equalization surcharges. Other financial commitments from the State of Florida include: assistance in securing financing; non-competitive JUA rates; statutory authority to impose regular and emergency assessments; Florida travel discounts used

by JUA employees; use of the Florida Treasurer's Investment Account; and use of the DOI's employees and facilities during its start up period.

The Government argues that the JUA's tax exemptions are merely part of the generous tax breaks given by governments to private entities, and should not constitute the type of financial commitment that would make an entity an "integral part of the state."[15] The Government also argues that the premium tax exemption is similar to the temporary tax exemption given by section 624.4072, *Florida Statutes*, to minority-owned property and casualty insurers, which does not exempt those insurers from federal income tax. Likewise, the Government takes the position that the assessments and surcharges received by the JUA are not a financial commitment because they represent amounts contractually paid in consideration for the provision of property and casualty insurance coverage. The Government also suggests that the JUA is not dependent on the state's coercive power for funding because it is funded primarily by premiums and assessments it collects on insurance that it sells. *See Texas Catastrophe Prop. Ins. Ass'n v. Morales*, 975 F.2d 1178, 1182–83 (5th Cir. 1992) ("That the state holds, and exercises, the coercive power to force private insurers doing business in Texas to cover certain risks does not mean that the money coming out of the companies' bank accounts is state money.").[16]

---

assets become property of the State of Florida and are deposited into Florida's CAT Fund.

**14.** The JUA has received $11,087,241 through June of 1995 as a result of its exemption from the state premium tax; $28,007,915 through December of 1999 as a result of its exemption from state corporate income tax; and $2,602,083 through December of 1999 as a result of its exemption from state intangible tax.

**15.** The Government notes that the State of Florida offers a wide variety of tax exemp-

tions to entities not exempt from federal income taxation. *See, e.g.,* § 629.401(4) (insurance exchanges); § 288.99(6)(a) (premium tax credits for insurance companies); § 288.106(2) (refunds to target industries); § 199.185(5) (banks); § 199.185(8) (insurers).

**16.** The Government argues that the JUA is similar to the statutorily created association of private insurers at issue in *Texas Catastrophe Property Insurance Association v. Morales*, 975 F.2d 1178 (5th Cir.1992), which the Fifth Circuit determined was not a state agency. The ultimate issue in *Morales* was consider-

Despite the Government's characterization of the state's financial commitment to the JUA, the totality of the financial factors demonstrate that the JUA is an integral part of the State of Florida. *See also Michigan v. United States;* 40 F.3d 817, 829 (6th Cir.1994) ("[T]he funds of many public corporations, authorities, and similar establishments, come primarily from persons to whom the entity provides a service—and it is immaterial that such funds are earmarked for the benefit of those who receive the service."). The determinative test with respect to the financial arrangements regarding the JUA is whether it is the State or the participating private insurance companies who ultimately may profit from its operations, and the undisputed evidence is that only the state may receive any financial benefit.

C. *Other Natural Disaster Entities*

■ In arguing that it is an integral part of the State of Florida, the JUA has submitted private letter rulings concerning the status of organizations that the JUA argues are materially identical to the JUA in purpose and attributes. These private letter rulings concerned the California Earthquake Authority ("CEA") (JUA Ex. M), the Hawaii Hurricane Relief Fund ("HHRF") (JUA Ex. P), and the Florida Hurricane Catastrophe Fund ("CAT Fund") (JUA Ex. L) (collectively "Natural Disaster Rulings"). As noted in each of the rulings and in section 6110(j)(3) of the

Internal Revenue Code, these rulings were directed only to the taxpayer that requested the ruling at issue and may not be used or cited as precedent. *See* 26 U.S.C. § 6110(j); *see also American Ass'n of Christian Schools Voluntary Employees Beneficiary Ass'n Welfare Plan Trust v. United States,* 850 F.2d 1510, 1515 n. 6 (11th Cir.1988) (recognizing that unpublished IRS rulings may not be cited or relied on as precedent, even though they may be used as evidence of IRS administrative practice); *Transco Exploration Co. v. Commissioner,* 949 F.2d 837, 840 (5th Cir.1992) (considering private letter rulings relevant to IRS decision under review and stating that "[a]lthough the Commissioner is entitled to change his mind, he ought to do more than stride to the dais and simply argue in the opposite direction"). With respect to the private letter rulings, I recognize that they are indicative of the IRS's position, even though they are not controlling. Therefore, I will briefly note the similarities, and any differences, between the JUA and the entities at issue in the Natural Disaster Rulings, understanding that these rulings are not controlling in this case.

A comparison of the JUA to the CEA, HHRF, and CAT Fund reveal that the JUA has many similarities to these entities and few dissimilarities. First, the JUA's public purpose is essentially the same as that of the three other Natural Disaster-

---

ably different: whether Texas could require the Texas Catastrophe Property Insurance Association ("CATPOOL") to be represented only by the State Attorney General. CATPOOL wrote its own policies and paid its own claims from premiums and assessments against its member companies. It also was operated pursuant to a plan of operation adopted by the State Board of Insurance with the advise of the CATPOOL board of directors, the majority of which were representatives of the member companies. *See id.* at 1179. The Fifth Circuit found that CATPOOL

was entitled to retain its own counsel because it was not a part of the State of Texas. The Court determined that CATPOOL was not a part of the state because its profits did not go to the state and its member companies received distributions from the profits. *See id.* at 1183. The undisputed evidence in this case is that the participating private companies receive no profits or distributions, and that any and all JUA profits will eventually go to the State of Florida. Thus, this case is markedly different from *Texas Catastrophe Property Insurance Association v. Morales.*

entities, including the California Earthquake Authority, which the IRS found to be an integral part of the State of California. *See* JUA Ex. M at 9 ("The harm from Events and other natural disasters is often so great that assistance from local and state governments and the Federal government is necessary to assist in recovery. The coverage provided by the Fund will help citizens of State to recover from the catastrophic effects of an Event."). Specifically, the JUA's public purpose goals include: helping Florida citizens recover from the catastrophic effect of hurricanes on the availability of property insurance; aiding a private insurance market in crisis; ameliorating the destabilizing effects on the insurance market, which basically affects all Florida insurers and Florida property-owners, as well as a large segment of the Florida economy; and exercising Florida's power to regulate the Florida insurance industry. *See Vesta Fire Ins. Corp. v. Florida*, 141 F.3d 1427, 1434 (11th Cir. 1998) (JUA Ex. Q) (recognizing legitimate public purpose in protecting and stabilizing Florida economy).

Private Letter Ruling 95–07–037 (Nov. 21, 1994) (JUA Ex. L) concerned the Florida Hurricane Catastrophe Fund ("CAT Fund"), which like the JUA was established by the Florida Legislature after Hurricane Andrew. The IRS specifically noted three attributes of the CAT Fund in determining that the State of Florida had a financial interest in it. First, it was significant that the CAT Fund could levy assessments on non-participants, which the IRS characterized as the state effectively exercising its power to collect revenue and appropriating such revenue to the CAT Fund. Second, the state could appropriate money from the CAT Fund for purposes unrelated to the CAT Fund's obligations

under its contracts. Third, the state received the assets of the CAT Fund upon its termination. Moreover, the IRS found that the State of Florida exercised direct control of the administration and operations of the CAT Fund through the State Board of Administration, which consisted of the Governor, Comptroller, and Treasurer. For these reasons, the CAT Fund was an integral part of the State of Florida. JUA Ex. L at 5.

Private Letter Ruling 96–22–019 (Nov. 8, 1996) (JUA Ex. M) concerned the California Earthquake Authority ("CEA") and Private Letter Ruling 96–27–016 (Apr. 5, 1996) (JUA Ex. P) concerned the Hawaii Hurricane Relief Fund ("HHRF"), both of which are similar in attributes and purpose to the JUA. The CEA's governing body consisted of elected state officials or their designees, and state officials controlled the membership of the CEA's advisory panel, which included representatives of the insurance industry. Furthermore, the California Legislature was required to review the CEA's plan of operation, and all meetings of the governing board and advisory panel had to be public. Daily administration of the CEA was directed by the California Insurance Commissioner. JUA Ex. M at 8. California's financial commitment to the CEA was recognized by the IRS, in part, because the state effectively made an annual contribution to it of the premium tax equivalent that was charged to policyholders and was retained by the CEA.[17] Finally, California received the remaining assets upon termination of the CEA. In Private Letter Ruling 96–27–016, the IRS determined that the HHRF was an integral part of the State of Hawaii for most of the same reasons. JUA Ex. P at 6–7.

---

**17.** The IRS explained that, "[t]he result is substantially the same in this case as if State had collected the premium tax and contributed the full amount of that premium tax directly to the Fund." JUA Ex. M at 8–9.

The Government contends that the CEA and HHRF are distinguishable from the JUA. First, both the CEA and the HHRF were governed by a board of high-ranking state officials.[18] Second, unlike the JUA, both CEA and HHRF employees were state employees. Third, the funds of both the CEA and the HHRF could be used by their respective states for mitigation programs. Fourth, the HHRF was part of Hawaii's Department of Commerce and Consumer Affairs; and fifth, the HHRF received state funding through special fees charged on mortgages. For these reasons, the Government contends that the JUA is materially different from the entities at issue in the private letter rulings. However, to the extent superficial dissimilarities do exist between the JUA and these other entities, a reasonable review of all the evidence in the record reflects that there are no real substantive differences. The governing board of the JUA is actually selected by the Insurance Commissioner and he effectively controls it. The JUA employees act, in many respects, as state employees, and many state employees do actually perform activities on behalf of the JUA. Most importantly, any JUA financial gains or earnings ultimately must be distributed to the state, so the funds of the JUA are tantamount to being state funds.

After evaluating the totality of the circumstances surrounding the JUA's creation and operation, it is clear that the JUA's funds are devoted exclusively to the citizens of the State of Florida or the State itself (upon dissolution) for the purposes of hurricane relief, which is a public purpose and an appropriate governmental function. The State of Florida, through the DOI, clearly controls the JUA.[19] Most notably, a majority (in actuality, all) of the JUA's Board of Governors are appointed by the Florida Insurance Commissioner.[20] The reasons for establishing the JUA and the manner in which it was established, as well as the fact that it is designed to be noncompetitive and to be "depopulated," *i.e.*, to put itself out of business, demonstrate that it serves a public function. Specifically, the Florida Legislature sought to pro-

---

**18.** The Board of the HHRF included the Insurance Commissioner and six other individuals appointed by the Governor with the advise and consent of the State Senate.

**19.** With respect to the issue of control, in Revenue Ruling 87–2, the IRS found that a Lawyer Trust Account Fund created by a State Supreme Court was an integral part of the state because of the Supreme Court's degree of control over the Fund. The IRS recognized that:

the Supreme Court's creation of the Fund and its ability to select and remove the Fund's governing body, to control the Fund's investments and expenditures, to monitor the Fund's daily operation, and to abolish the Fund indicate that the Fund is not an independent entity, but rather is an integral part of the state. Therefore, income earned by the Fund is not subject to federal income tax.

JUA Ex. O at 3. For many of the same reasons related to the control exercised by the DOI,

the JUA is an integral part of the State of Florida

**20.** Several cases have been decided on the basis that entities are controlled by private interests when such interests controlled a majority of the governing board of directors. *See, e.g., United States v. Maryland Savings–Share Ins. Corp.* 400 U.S. 4, 7, 91 S.Ct. 16, 18, 27 L.Ed.2d 4 (1970) (finding nonprofit mutual insurance corporation to not be state instrumentality and public appointees held less than 30% of the seats on the board); *Morales, supra,* 975 F.2d at 1179, 1183 (finding CAT-POOL was not part of State of Texas, in part, because majority of board of directors were representatives of industry members); *Philadelphia Nat'l Bank v. United States,* 666 F.2d 834, 837 (3d Cir.1981) (finding university to be private corporation governed by privately controlled board of trustees, only 40% of whom were designated public officials or government appointees). The reverse principle must apply when the State controls the majority of the governing board.

vide property insurance, which is essential to property ownership, to those citizens who could not otherwise obtain such insurance due to natural disasters. As a practical matter, the Department of Insurance and the Insurance Commissioners have pursued this goal by exercising total control over the JUA and treating it as an extension of the Department of Insurance. Therefore, I find that there are no genuine issues of material fact and that, as a matter of law, the JUA is an integral part of the State of Florida, exempt from federal income taxes for the years at issue in this litigation.

### III. CONCLUSION

For the above reasons, the plaintiff's motion for summary judgment (doc. 32) is GRANTED, and the defendant's motion (doc. 35) is DENIED. The Clerk shall enter judgment accordingly for the plaintiff, together with taxable costs.