**GREAT LAKES HIGHER EDUCATION CORPORATION, a non-profit Chapter 181 Wisconsin Corporation, Plaintiff–Appellant,**

v.

**Lauro F. CAVAZOS, Secretary of the United States Department of Education, and United States Department of Education, Defendants–Appellees.**

No. 89–2748.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1990.

Decided Aug. 29, 1990.

Rehearing Denied Sept. 27, 1990.

Ann Ustad Smith, James H. Bowhay, David J. Hanson, Michael, Best & Friedrich, Madison, Wis., for plaintiff-appellant.

Neil H. Koslowe, Dept. of Justice, Civ. Div., Appellate Section, Neil H. Koslowe, Washington, D.C., for defendants-appellees.

John E. Dean, Clohan & Dean, Washington, D.C., for amicus curiae Consumer Bankers Ass'n.

Robert E. Jensen, George G. Olsen, Williams & Jensen, Jean Froelicher, Washington, D.C., for amicus curiae National Council of Higher Educ. Loan Programs, Inc.

Before POSNER and KANNE, Circuit Judges, and SNEED, Senior Circuit Judge.*

---

* Hon. Joseph T. Sneed, of the Ninth Circuit, sitting by designation.

SNEED, Senior Circuit Judge.

Great Lakes Higher Education Corporation (Great Lakes) appeals in its suit for a declaration that the amendment to the Higher Education Act of 1965 enacted in 1987 violates the Fifth and Fourteenth Amendments. The district court rendered summary judgment for appellee Secretary of Education (Secretary). 711 F.Supp. 485. We affirm.

## I. FACTS AND PROCEEDINGS BELOW

In 1965, Congress enacted the Higher Education Act (Act), Pub.L. No. 89–329, 79 Stat. 1232 (1965) (codified as amended at 20 U.S.C. §§ 1071–99 (1988)), which established the Guaranteed Student Loan Program (GSLP). The GSLP assists students in obtaining low-interest financing for postsecondary education. The program attempts to achieve this goal through three basic steps. First, the government subsidizes interest payments on loans to students made by lenders. Second, a state or state-designated private, nonprofit agency guarantees the loans. Finally, the federal government reinsures the state guarantee agencies. This lawsuit involves the government's reinsurance function.

A state wishing to enable its students to benefit from the GSLP must either establish a state agency or designate a private nonprofit agency to guarantee these loans. In Wisconsin, the designated agency is the plaintiff, Great Lakes, formerly known as Wisconsin Higher Education Corporation. This agency was established in 1967 as a nonstock, nonprofit corporation. Like other guarantee agencies, Great Lakes entered into an "insurance program agreement" with the Secretary. Under this agreement, Great Lakes must pay 100 percent of the unpaid principal on a qualifying loan in case of default or failure to repay by the student borrower. 20 U.S.C. § 1078(b)(1)(G). Moreover, upon entering the program, Great Lakes agreed to conform both to the existing federal statutes and regulations and to new obligations that Congress or the Secretary might impose in the future.[1] Great Lakes consented to these terms in the insurance program agreement, which became effective on March 10, 1977.

The Secretary is empowered under the Act to enter into agreements with the guaranteeing agency for reinsurance and supplemental reinsurance. 20 U.S.C. § 1078(c)(1)(A). For this coverage, the agency must pay the Secretary a reinsurance "fee" that is determined by statute. 20 U.S.C. § 1078(c)(9). The reinsurance agreements provide for a graduated reimbursement schedule; 100 percent reimbursement by the Secretary if the agency's loan default rate is less than 5 percent, 90 percent reimbursement if that rate is between 5 percent and 9 percent, and 80 percent reimbursement if that rate exceeds 9 percent. 20 U.S.C. § 1078(c)(1)(A)–(B). The agreements also stipulate that the Secretary may withhold reinsurance payments if the agency fails to comply with the Act or regulations. Finally, the Secretary is authorized to make two other payments to the agency: cash "advances" to begin operation pursuant to 20 U.S.C. § 1072(a)(1) and "administrative cost" allowances to offset operating costs under 20 U.S.C. § 1078(f)(1)(A).

Great Lakes' assets, which include federal advances, reinsurance payments, and administrative cost allowances, must be deposited into a "reserve fund," 34 C.F.R. § 682.410(a)(1) (1989), which may only be used for GSLP purposes, 34 C.F.R. § 682.410(a)(2) (1989).[2] By 1986, Great Lakes had accumulated $31,680,014 in its reserve fund. Many other guarantee agencies also built up large reserves.

---

**1.** The basic agreement provides: "The Agency shall be bound by all changes in the Act or Regulations in accordance with their respective effective dates." This language is also included in the reinsurance contract.

**2.** This fund also holds a portion of the amount collected by Great Lakes from a borrower after default on a loan for which the Secretary reimbursed the guarantee, gifts and grants, investment earnings, and state appropriations. 34 C.F.R. § 682.410(a)(1).

The advantageous financial position of these agencies across the country led the United States General Accounting Office (GAO) in June of 1986 to issue a report discussing the financing of guarantee agencies under the GSLP. U.S. Government Accounting Office, *Guaranteed Student Loans: Better Criteria Needed for Financing Guaranty Agencies* (1986) [hereinafter *GAO Report*]. The GAO found that guarantee agencies had built up huge cash reserves and that these reserves were being used for non-GSLP purposes. *GAO Report*, at 2–4. The GAO recommended "that the Congress amend the Higher Education Act to require the Secretary of Education to establish ... criteria for the appropriate levels of reserves [that] guarantee agencies should retain, based on the financial risks they face...." *Id.* at 29. To reduce these large unnecessary reserves, the GAO proposed a formula to determine the maximum allowable cash reserve.[3] Once a maximum level is established for a particular agency, "the growth of future agency reserves [should be restricted] beyond the established levels." *GAO Report*, at 29.

Congress responded to these recommendations with the Omnibus Budget Reconciliation Act (1987 amendment),[4] which provides guidelines for determining maximum cash reserves and recovery of excess cash in the reserves. The 1987 amendment also made the right to receive reinsurance payments and administrative cost allowances conditional on the agency's compliance with the recovery portion of § 1072(e) unless the Secretary issued a waiver.[5]

On February 9, 1988, after the 1987 amendment had gone into effect, the Secretary notified Great Lakes that its excess reserves of $13.49 million must be transferred to the federal GSLP insurance fund pursuant to 20 U.S.C. § 1081(a).[6] Great Lakes neither applied for a waiver nor questioned the allocation of the recovery to the GSLP insurance fund. It simply refused to comply with the Secretary's order to transfer its excess funds and brought this suit on February 26, 1988. The Secretary, in September 1988, began withholding reinsurance reimbursements from Great Lakes. This process continued until January 1989, when the entire $13.49 million had been recovered.

In its suit against the Secretary, Great Lakes sought a declaration that the 1987 amendment was unconstitutional. In a comprehensive order, the district court rejected all of Great Lakes' constitutional challenges and granted the Secretary's motion for summary judgment. It held first that there was no unconstitutional "taking" of private property because Great Lakes entered into contractual agreements with the Secretary which required compliance with future amendments. In the court's view, the effect of the 1987 amendment did not constitute a taking because "the terms governing [Great Lakes' right to reimbursement] could be changed by legislative amendment [and that even though the] effect of those changes could be to lower plaintiff's reserves, ... such an effect does not constitute a taking." The court also rejected Great Lakes' Takings Clause challenge to the method of recapturing excess

3. The proposed formula was contained in a separate report. *See* U.S. General Accounting Office, *Guaranteed Student Loans: Guidelines for Reducing Guaranty Agency Reserves* 1–3 (1986).

4. Pub.L. No. 100–203, §§ 3001–3003, 101 Stat. 1330–36 (1987) (codified as amended at 20 U.S.C. § 1072(e)). The 1987 amendment expired automatically on September 30, 1989. *See id.* § 3002, 101 Stat. 1330–38.

5. Under 20 U.S.C. § 1072(e)(3), the Secretary may waive the transfer requirement if he determines that (1) the agency's financial position has deteriorated significantly, (2) significant changes in economic circumstances or the loan

insurance program render the agency's reserve ceiling limitations inadequate to allow continued operation of the agency, or (3) an agency would be compelled to violate contractual obligations existing on December 22, 1987.

6. This figure represents the "excess" amount of the $31,680,014 that Great Lakes held in its reserve fund on September 30, 1986. The parties do not dispute that the sum of $13,490,858 represents the correct amount of Great Lakes' excess cash reserve as defined by, and formulated under, 20 U.S.C. § 1072(e)(1) & (4). Great Lakes challenges the provision authorizing the Secretary to make this calculation and not the manner in which he calculated the amount.

cash reserves. The court concluded that "defendants are not taking any money in plaintiff's reserves.... [They are] merely requiring plaintiff to use the money already in its reserve fund for Guaranteed Student Loan Program purposes as prescribed by statute and regulation. Neither the implementation nor the effect of the 1987 amendments constitute a taking of plaintiff's reserves."

Second, the court held that the 1987 amendment was not a repudiation of the Secretary's obligation to pay Great Lakes' reinsurance costs and administrative cost allowances. The court determined that the 1987 amendment merely imposed a new condition on the fulfillment of the Secretary's obligations. It concluded that "[b]ecause the obligations are not incurred until the condition is met, there is no debt that can be repudiated." Finally, the court dispensed with appellant's equal protection claim by holding that the 1987 amendment was rationally related to the legitimate legislative purpose of "reducing the federal cost of running the Guaranteed Student Loan Program without materially harming [guarantee agencies]." [7]

On appeal, Great Lakes contends that (1) the "confiscation" of 40 percent of Great Lakes' reserve fund constitutes a taking of private property for public use without just compensation in violation of the Fifth Amendment; (2) the withholding of federal payments for reinsurance and administrative cost allowances also violates the Fifth Amendment Takings Clause by abrogating Great Lakes' contractual right to receive them; and (3) the repudiation of reinsurance contracts by the government is an unconstitutional questioning of the validity of a public debt in violation of the Fourteenth Amendment.

## II. JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 (1988); 28 U.S.C.

§ 1291 (1988) confers jurisdiction over the appeal in our court.

## III. DISCUSSION

### A. *Was the Excess Cash in the Reserve Fund Private Property?*

■ The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. Our first inquiry is whether the reserve fund is "private property." *See United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945). As a general matter, a holder of private property enjoys the right of "free use, enjoyment, and disposal," *Buchanan v. Warley*, 245 U.S. 60, 74, 38 S.Ct. 16, 18, 62 L.Ed. 149 (1917), and the "right to exclude others," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011, 104 S.Ct. 2862, 2877, 81 L.Ed.2d 815 (1984).

Federal law regulates the reserve fund extensively and it exists because of a federal mandate. 34 C.F.R. § 682.410(a)(1). Moreover, its sources are substantially from the federal government and the uses to which it may be put are restricted to paying default claims, refunding overpayments of insurance premiums, administering the guarantee program, and repaying advances made by the Secretary. *Id.* § 682.410(a)(2) & (a)(3). Regulations specify that the reserve fund monies are to be used only for GSLP purposes. [8]

Indeed, the guarantee agency itself is heavily regulated by federal law. *Id.* § 682.400. The purpose and legal structure of Great Lakes places it in that borderline between the wholly public and wholly private instrumentality. The extensive federal regulation of the agency suggests

---

**7.** Great Lakes has abandoned its equal protection argument on appeal.

**8.** We recognize, of course, that 34 C.F.R. § 682.410(a)(6) authorizes investment of certain reserve fund monies for non-GSLP purposes and the retention by the agency of any return on investment over the original investment

amount, which must be returned to the reserve fund. A guarantee agency may well have a property interest in the earned investment return of those reserve fund monies that are invested under this regulation. The parties neither raised nor briefed this novel question and we express no opinion on this issue.

its highly public nature. Although this characteristic does not absolutely preclude a successful constitutional challenge such as the one attempted here, it does suggest that any such attack requires precise identification of the "private" property at issue as well as a "taking" distinguishable from public regulation consistent with the purpose of the instrumentality.

■ Congress intended the GSLP to assist needy persons in their quest for advanced educational opportunities. H.R. Rep. No. 383, 99th Cong., 2d Sess. 4–8 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 2572, 2575–79. We find no indication that Congress meant for the reserve fund excesses to be irrevocably committed to the guarantee agencies. *Cf. Dayton–Goose Creek Ry. v. United States,* 263 U.S. 456, 484, 44 S.Ct. 169, 174, 68 L.Ed. 388 (1924) (rejecting Takings Clause challenge to statute permitting government recapture of excess funds collected by rail carriers above set rate of return because these funds were not private property).[9] In essence Great Lakes is an intermediary between the United States and the lender of the student loan. The United States is the loan guarantor of last resort. Great Lakes assists the United States in performing that function. It cannot be compelled to perform that function, nor can it insist that its compensation for that service be irrevocably fixed. We, therefore, conclude that the reserve fund excess is not "private property" for purposes of the Fifth Amendment.[10]

## B. *Was There an Abrogation of Contractual Rights in Violation of the Fifth Amendment?*

■ Great Lakes argues that the method of recapture used, the withholding of reinsurance funds, was a "taking of private property" because it abrogated fixed contractual rights of Great Lakes. We have already indicated enough to suggest that this claim is without merit. We shall address it in more detail, however. The Fifth Amendment protects "[r]ights against the United States arising out of a contract." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). We confront two issues: (1) whether the 1987 amendment altered a preexisting contractual right to reimbursement with respect to loans made subsequent to the date of the 1987 amendment; and (2) whether the 1987 amendment abridged a contractual right to reimbursement of funds with respect to loans guaranteed prior to the 1987 amendment. In neither case do we find appellant's arguments persuasive.

We easily dispatch the first issue. Although the 1987 amendment reaffirmed a "contractual right" to reimbursement, *see* 20 U.S.C. § 1078(c)(1)(A), this right has always been contingent on Great Lakes' compliance with federal law and regulations.[11] Indeed, the reimbursement agreement between the Secretary and Great Lakes itself explicitly accords the Secretary a right to withhold funds for noncompliance:

---

**9.** In cases factually similar to the instant case, three circuit courts of appeals have already rejected the contention that reserve funds are "private property" for purposes of the Fifth Amendment. *See, e.g., Education Assistance Corp. v. Cavazos,* 902 F.2d 617, 626–27 (8th Cir.1990); *Ohio Student Loan Comm'n v. Cavazos,* 900 F.2d 894, 899 (6th Cir.1990); *South Carolina State Educ. Assistance Auth. v. Cavazos,* 897 F.2d 1272, 1276 (4th Cir.1990). In each of these cases, the court found the high degree of federal regulation of the reserve fund dispositive in determining that the fund was not "private property."

**10.** The statute authorized the Secretary to eliminate excess reserves through one or more of the following methods: (1) by reducing advances payable to the guarantee agency; (2) by withholding reinsurance payments; (3) by reducing payments to the agency; and (4) by any other method of increasing payments to the Federal Government or decreasing payments to the guarantee agency. 20 U.S.C. § 1072(e)(2)(A)–(D). Inasmuch as only the second method was used in this case, we need not address whether three of the four methods of recapture constitute a "taking."

**11.** The provision itself so states: "The guaranty agency shall, subject to section 1072(e) of this title, be deemed to have a contractual right against the United States, during the life of such loan, to receive reimbursement according to the provisions of this subsection." 20 U.S.C. § 1078(c)(1)(A). Section 1072(e), of course, is the provision reducing excess cash reserves.

**16**

13. If the Commissioner finds that any of the assurances or representations made by the Agency in connection with this Agreement are incomplete or incorrect in any material respect or that there has been a failure by the Agency to comply with any of the provisions of the Agreement or applicable Federal law or regulations, he may take such action short of termination as may be necessary to protect the interests of the United States. Such action may include *withholding payments to be made to the Agency....*

(Emphasis added.) Great Lakes can thus make no colorable argument that the withholding provision constitutes a breach of a contractual right pertaining to loans made subsequent to the 1987 amendment.[12]

■ The second issue is a bit more difficult. Great Lakes contends that its rights against the United States "arising out of contract" with respect to loans made before the 1987 amendment were "taken" by that amendment. Whether contract rights are "private property" for Fifth Amendment purposes "depends on whether Congress reserved power to alter the terms of the contract." *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 628 (8th Cir.1990).

■ Although in this instance Congress did not expressly reserve the authority to amend or repeal the 1965 Act, we agree with the other circuit courts of appeals that have addressed this issue in holding that Congress implicitly reserved the right to amend the Act and alter the terms of the contract between the Secretary and Great Lakes. *See, e.g., Education Assistance Corp.*, 902 F.2d at 629; *Ohio Student Loan Comm'n v. Cavazos*, 900 F.2d 894, 901–02 (6th Cir.1990); *South Carolina State Educ. Assistance Auth. v. Cavazos*, 897 F.2d 1272, 1276 (4th Cir.1990). These courts based this conclusion on prior actions by Congress to amend the Act, which reflected an intent to reserve power to impose additional requirements, and on the need for "responsive[ness] to 'ever-changing' conditions." *Education Assistant Corp.*, 902 F.2d at 629 (citation omitted); *see also Ohio Student Loan Comm'n*, 900 F.2d at 901–02; *South Carolina State*, 897 F.2d at 1277. As the Supreme Court has stated, "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986).[13] We con-

---

**12.** Great Lakes puts much stock in *Lynch v. United States* as controlling authority. We are unpersuaded. In *Lynch,* the plaintiffs had paid monthly insurance premiums to the government for War Risk Insurance policies. 292 U.S. at 576, 54 S.Ct. at 842. Congress passed a statute repealing all laws that pertained to or granted yearly renewable term insurance. *Id.* at 578–79, 54 S.Ct. at 843–44. The Supreme Court held that the law violated the Takings Clause. *Id.* at 579–80, 54 S.Ct. at 843–44. In the instant case, by contrast, the 1987 amendment abrogated no right to receive reinsurance payments. This right still exists and Great Lakes may exercise it upon fully complying with the relevant statutory and regulatory requirements.

True, Great Lakes has paid premiums for reinsurance and has the burden to operate and manage the program on a day-to-day basis. But these circumstances do not provide an adequate basis for finding a Fifth Amendment property right through an alleged breach of contractual obligations in view of the withholding provision in the contract itself. Moreover, the performance of appellant's duties under the program does not serve as "consideration" in a contract

sense for the government's obligation to reimburse. To so hold would lay the federal government open to untold Fifth and Fourteenth Amendment claims in its administration of federal-state programs.

**13.** The Court observed that this position takes on "added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation." *Bowen,* 477 U.S. at 53, 106 S.Ct. at 2397 (Social Security program). In *Bowen,* the Court emphasized that " '[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' " 477 U.S. at 52, 106 S.Ct. at 2397 (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). We would unduly hamstring efforts by Congress to refine the GSLP in light of the program's experience if we were to hold that it failed to reserve to itself the power to amend the Act.

clude, therefore, that Congress had power to amend the Act.

The power to amend, however, can exceed the permissible limits for such action under the Fifth Amendment. In the *Sinking-Fund Cases*, the Supreme Court observed that Congress "cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into." *Union Pac. R.R. v. United States,* ("*Sinking-Fund Cases*"), 99 U.S. 700, 721, 25 L.Ed. 496, 504 (1879).

The 1987 amendment does not relieve the federal government of its obligation to reimburse guarantee agencies. The purpose of this amendment is merely "to recover excess cash reserves ... [without] materially harm[ing] an agency's ability to fulfill its function in the guaranteed student loan program." H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 518–19 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–1264—2313–1265.

In short, the 1987 amendment merely adds a reasonable requirement to the regulatory framework governing the relations between guarantee agencies and the Secretary; it does not affect the contractual obligations of the United States to reimburse guarantee agencies when they comply with all relevant conditions for payment. "Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed." *United States v. Locke,* 471 U.S. 84, 107, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985).[14]

### C. Has the Secretary "Questioned" a Public Debt?

■ The Fourteenth Amendment provides that "[t]he validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned." U.S. Const., amend. XIV, § 4. This little used provision of the Fourteenth Amendment was intended to prevent the "questioning" of the war debt incurred by the Union in fighting the Civil War by any future Congress controlled by southerners and their sympathizers. This section is only brought into play when some state or federal government agency questions a debt.[15]

No such "questioning" occurred here. *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935), is inapposite. In *Perry,* the Supreme Court applied section 4 of the Fourteenth Amendment to Congress' attempt to renounce the payment of United States bonds which promised on their face that payment would be in gold. *Id.* at 354, 55 S.Ct. at 436–37. Prior to redemption of the bonds, but after their purchase, Congress declared that payment would be by legal tender only. *Id.* at 348–49, 55 S.Ct. at 434. Although the plaintiff in *Perry* could not prove that he had sustained a loss warranting damages, *id.* at 358, 55 S.Ct. at 438, the Court used strong language to confirm the binding obligations of the government when it incurs debts. "To say that the Congress may withdraw or ignore [its pledge to repay on the credit of the United States] is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government." *Id.* at 351, 55 S.Ct. at 435.

**14.** Great Lakes' argument is made weaker by its failure to protest the reinsurance fee provision, which was added to the program in 1986. *See* 20 U.S.C. § 1078(c)(9). Appellant effectively asks us to conclude that the 1987 amendment was an unconstitutional impairment of a contractual obligation yet the 1986 amendment was not. Both amendments appear to constitute the type of regulatory amendments permitted under the Fifth Amendment.

**15.** Great Lakes does not make clear whether it is arguing that the 1987 amendment or the Secretary's action in implementing that amendment constitutes the alleged "questioning." In either case, the government must create a "debt" that it attempts to question.

**18**

In the instant case, neither Congress, through the 1987 amendment, nor the Secretary has questioned any valid debt. The Secretary took nothing from the agency except the use of funds made available through circumstances unanticipated by either Great Lakes or the United States. We accordingly find no violation under the Fourteenth Amendment.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Secretary.

AFFIRMED.