**MISSISSIPPI SURPLUS LINES ASSOCIATION Plaintiff**

**v.**

**State of MISSISSIPPI and J.K. Stringer, in his Official Capacity as State Fiscal Officer Defendants**

**No. CIV. A. 3:04CV670LN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

June 30, 2006.

Thomas A. Cook, C. Ted Sanderson, B. Wade Smith, IV, Copeland, Cook, Taylor & Bush, Ridgeland, MS, for Plaintiff.

---

Meredith McCollum Aldridge, Mississippi Attorney General's Office, Jackson, MS, Bourdeaux & Jones, Charles W. Wright, Jr., Palmer, Wright & Williamson, Meridian, MS, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on cross-motions for summary judgment by plaintiff Mississippi Surplus Lines Association and defendant J.K. Stringer, in his official capacity as State Fiscal Officer. Each party has responded to the other's motion and the court, having now considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that defendant's motion is well taken and should be granted, from which it follows that plaintiff's motion is due to be denied.

*Background*

The Mississippi Insurance Department is charged by law with regulating insurance companies and agents which do business in this state, including domestic and foreign insurance companies, and eligible nonadmitted insurers, also known as surplus lines insurers. As the latter are not considered licensed, admitted insurers, Mississippi insurance law requires the Insurance Commissioner to, among other things, determine whether surplus lines insurers meet the requirements of state law and publish a list of eligible, nonadmitted insurers, Miss.Code. Ann. § 83–21–17; review applications and collect fees from agents applying for licensure to place insurance with surplus lines insurers, Miss. Code Ann. § 83–21–19; receive biannual reports from surplus lines agents of gross premiums received from surplus lines insurance, Miss.Code Ann. § 83–21–25; and collect a 4% premium tax on all gross premiums received from surplus lines insurance, Miss.Code Ann. § 83–21–25.

Mississippi Code Annotated § 83–21–21, enacted in 1997, authorizes the Mississippi Commissioner of Insurance to "rely upon the advice and assistance of a duly constituted association of surplus lines agents in carrying out the purposes of this chapter," § 83–21–21(3), and provides that

> [u]pon request from the association, the Commissioner of Insurance may approve the levy of an examination fee of not more than one percent (1%) of premiums charged under this chapter for the operation of the association to the extent that such operation relieves the commissioner of duties otherwise required of the Commissioner of Insurance under this chapter.

Miss.Code Ann. § 83–21–21(7).

In 1997, Mississippi Surplus Lines Association (MSLA) was created, having been organized and incorporated by private individuals as a nonprofit corporation pursuant to Mississippi's Nonprofit Corporations Act. MSLA was accepted by the Commissioner as the association of surplus lines agents to provide the Commissioner with advice and assistance as provided in § 83–21–21(3), and in that same year, as provided by § 83–21–21(7), MSLA was authorized by the Commissioner to levy a 1% examination fee.

From 1997 through 2005, MSLA collected approximately $5.2 million in examination fees while expending only approximately $1.6 million, resulting in an excess of $3.6 million.[1] In 2004, the Mississippi

---

1. The State has presented uncontradicted evidence that in 1998, MSLA's first full year of operation, MSLA collected $478,034 in fees but had only $164,508 in operational expenses, leaving a $313,526 surplus, and in each succeeding year, there has been an annual surplus of funds, ranging from $393,583

Legislature amended § 83–21–21 by adding the following paragraph:

(9) The fees levied and collected by the association pursuant to this section have been and remain public funds and shall be subject to transfer to the Department of Insurance Special Fund by act of the Legislature; provided, however, that not more than Two Million Dollars ($2,000,-000.00) shall be transferred.

The legislature contemporaneously authorized the State Fiscal Officer to transfer to the State's Budget Contingency Fund varying amounts from certain enumerated special funds, including the Insurance Department Fees and Assessment Fund, Fund No. 3501, and provided that

[t]he funds required to be transferred from the Insurance Department's Fund No. 3501 in subsection (1) of this section shall be derived from funds transferred to the Insurance Department under Section 83–21–21(9), Mississippi Code of 1972, as amended by House Bill No. 834, 2004 Regular Session.

Pursuant to the amendments, the State directed the Commissioner to transfer $2 million to the State's Budget Contingency Fund, in response to which MSLA filed the present action for declaratory and injunctive relief contending that these amendments violate the Fifth and Fourteenth Amendments to the United States Constitution because the legislation "provide[s] for the taking of MSLA's private property for public use, without compensation and without due process." MSLA also alleges that the legislation violates Article 3, Section 17 of the Mississippi Constitute as it "direct[s] the taking of MSLA property without due compensation."

Both parties have moved for summary judgment, with MSLA contending that these amendments to § 83–21–21 are unconstitutional as a matter of law in that they direct the taking of $2 million of MSLA's *private* funds,[2] and with the State contending that the funds at issue are not private funds but rather are public funds in which plaintiff has no protected property interest and hence no cognizable claim for relief in this action.

The Fifth and Fourteenth Amendments prohibits a state's taking of private property without just compensation, and the protect against the deprivation of one's protected property interest without due process. Thus, as the parties recognize, unless the funds at issue are MSLA's private property, MLSA has no viable cause of action. Having considered the evidence and arguments of the parties in support of their respective positions, the court is of the opinion that the surplus funds collected by MSLA as examination fees under the auspices of the Commissioner are not private funds, and that consequently, the State's taking of those funds does not offend the constitution.

MSLA's position is hinged, first, on its contention that it is a private entity, and not part of the state. MSLA reasons that the State cannot prevail on its claim to the funds at issue unless it proves that MSLA is not a private company but instead is a

to $734,398, for a total cumulative surplus of approximately $3.6 million.

Presumably due to the fact that the percentage of fees levied has resulted in an excess in every year of MSLA's operation, and at MSLA's request, the Commissioner, which had originally approved a fee for the operation of MSLA in the amount of 1%, reduced the fee to .5% in 2000, and reduced the fee to .25% in 2003. According to the State, even at .25%, MLSA has still experienced a substantial annual surplus.

2. The Takings Clause of the Fifth Amendment of the United States Constitution provides, "[N]or shall private property be taken for public use, without just compensation."

part of the State and therefore, has no property rights. It argues that "[b]ecause MSLA is a private entity, the State may not physically take possession of MSLA's property for some public purpose" because such taking would violate the Fifth Amendment. Secondly, MSLA reasons that as a private entity, duly organized and incorporated under the Mississippi Non-profit Corporations Act, it is empowered by law to "take, receive . . . or otherwise acquire, own, hold, improve, use and other-wise deal in and with real or personal property," Miss.Code Ann. § 79–11–151(d), including to "invest and reinvest *its* funds," *id.* § 79–11–151(i) (emphasis add-ed), and that therefore, all funds which MSLA has collected are its private proper-ty.

There is no dispute that MSLA was organized and incorporated by private in-dividuals as a nonprofit corporation pursu-ant to Mississippi's Nonprofit Corporation Act. The initial funding to start up MSLA was provided through a loan to MSLA from a private bank loan arranged by indi-vidual directors. MSLA adopted by-laws for a nonprofit corporation, as provided by Mississippi's Nonprofit Corporations Act. Its directors are elected by its members, which meet annually and are entitled to vote on all matters for which members may vote by law. Consistent with its by-laws, which provide that "[a]ll corporate powers shall be exercised by or under the authority of, and the affairs of MSLA man-aged under the direction of, its Board of Directors," MSLA's executive director is responsible for the day-to-day operations of MSLA, subject to policies established by the Board of Directors. And, as MSLA notes, neither the Commissioner of Insur-ance, nor any other state official, has au-thority to appoint or remove MSLA's di-rectors.

In addition to these facts, MSLA, to-ward establishing that MSLA is a private corporation, points to a July 16, 2004 opin-ion issued by Mississippi Attorney General Jim Hood in which his office opined that as a nonprofit corporation, MSLA is not a "public body" and hence is not subject to the state's Open Meetings Law or the Mississippi Public Records Act; it is not a "political subdivision" of the state and hence is not covered by the Tort Claims Act or sovereign immunity; it is not a state "agency" or "governing authority" and thus is not subject to the state's laws regarding public purchasing and contract-ing; MSLA's officers and employees are not public officers or public servants by virtue of their employment with MSLA, and are therefore not subject to the state's rules governing conflicts of interest in ac-tivities and business relationships by pub-lic officers and servants; and in the same vein, its employees are not employees of the State and hence are not entitled to benefits provided to State employees. The Attorney General summarized MSLA's status, writing,

> While the MSLA performs certain gov-ernmental functions to assist the Com-missioner of Insurance, the Commission-er of Insurance remains responsible for the performance of these activities. The MSLA acts as or in a manner similar to an independent contractor in performing these functions.

Respecting its finances in general, MSLA points out that its by-laws provide that "[a]ll funds of MSLA shall be, from time to time, deposited to the credit of MSLA in such banks, trust companies or other depositories as the Board may select and shall be drawn out only by a check signed by the Chairman or the Secre-tary/Treasurer, or by automated facsimile signature under their control, or by those individuals authorized by the board." Ac-cordingly, the examination fees MSLA re-

ceives from its members are deposited by MSLA into MSLA's checking account, and those funds are used to pay its operating expenses. As the fees collected have exceeded operating expenses, MSLA has maintained investments of the surplus pursuant to its investment policy.[3]

MSLA's further notes that in accordance with a provision of its by-laws providing for independent audits of MSLA's accounts and books, MSLA has engaged a CPA firm to perform annual audits of the company, and the audit reports generated by that firm show that the examination fees (termed "stamping fees"), as well as MLSA's investments and other assets, belong to MSLA under generally accepted accounting principles.

MSLA relies further on a July 22, 2005 advisory opinion from the Mississippi Ethics Commission in which the Commission opined that MSLA could lease or purchase real property from a state legislator without violating any conflicts rules because the legislature had never appropriated funds to MSLA and therefore, funding for the purchase/lease was not provided by the legislature.

In short, MSLA argues that the funds at issue are MSLA's private funds inasmuch as MSLA was organized and has operated as an essentially autonomous private entity, funded entirely by private funds and without any funding from the state. However, contrary to MSLA's urging, it does not follow from the fact that MLSA is a private entity that any and all funds it receives necessarily are private funds. Nor is the fact that the funds at issue were received from "private" entities, rather than directly from the state legislature, determinative of the issue here.

MLSA's approach is to portray MSLA as a typical nonprofit trade association, collecting membership dues from its members and engaging in activities typical of such organizations; but the picture it paints glosses over many important details and distorts the reality of the organization's purpose, operations and funding. Among the many details MSLA neglects to address, or dismisses as insignificant, are the following. First, MSLA was organized as a nonprofit corporation of surplus lines agent for the sole purpose of assisting the Commissioner in performing the Commissioner's statutory duties. Its by-laws specifically recite that MSLA was established to fulfill the statutory role and to "relieve the Commissioner ... of duties otherwise required of him under the laws of foreign insurance companies;" no other purpose is identified. If the Commissioner's duties were not performed by MSLA in his place and stead, they would be performed by the Commissioner, or by some other association of surplus lines agents approved by the Commissioner for the purpose of performing the Commissioner's statutory duties on his behalf.

Moreover, the examination fees, although paid to MSLA by private entities, are not mere membership dues, but rather are assessed by MSLA pursuant to authority granted by the Commissioner, as provided by the legislature, and are intended to be used by MSLA only for the

---

**3.** There is no issue herein as to whether interest earned on the investment of the examination fee is MSLA's private property inasmuch as the legislation at issue does not attempt to take from MSLA any interest earned. *Cf. Great Lakes Higher Educ. Corp. v. Cavazos,* 911 F.2d 10, 14 n. 8 (7th Cir.1990) (recognizing that "[a] guarantee agency may well have a property interest in the earned investment return of those reserve fund monies that are invested" under a provision authorizing investment of certain reserve fund monies for non-governmental purposes and the retention by the agency of any return on investment over the original investment amount, which must be returned to the reserve fund).

operation of MSLA "to the extent that such operation relieves the commissioner of duties otherwise" required of the Commissioner by law. It is true, as plaintiff notes, that the legislature did not appropriate funds directly to MSLA for the performance of its duties on behalf of the Commissioner. There is no dispute about that. However, the legislature did establish a funding mechanism for MSLA: It authorized the Commissioner to approve the levy of an examination fee of up to 1% of premiums charged "for the operation of the association to the extent that such operation relieves the commissioner of duties otherwise required of the Commissioner of Insurance under this chapter." The examination fees are thus levied, collected and to be used for one purpose, and one purpose only: "for the operation of [MSLA] to the extent that such operation relieves the commissioner of duties otherwise required of the Commissioner of Insurance ...." As is thus clear from the statute, which is the sole source of MSLA's right to collect the examination fee, MSLA does not have free use of the monies collected as examination fees, but rather may use the fees only for its statutory purpose.[4]

MSLA acknowledges that its by-laws recite that MSLA was established to fulfill the statutory rule and to "relieve the Commissioner ... of duties otherwise required of him under the laws of foreign insurance companies," and that they identify no other purpose for the organization. It also admits that it provides advice and assistance to the Commissioner "pursuant to Section 83–21–21 and in compliance with MSLA's By–Laws." However, it denies that it performs any governmental func-

tion, and declares that in addition to the actions it performs as advising and assisting the Commissioner in the performance of his duties, it has "numerous other activities typical of any corporation." Yet the only other such activities it identifies are vaguely identified as "ha[ving] employees" and performing "various supervisory and human resource activities as an employer" and "leas[ing] real estate for its offices." It does not explain what these employees do, though, or what the function of the organization is, other than to advise and assist the Insurance Commissioner in the performance of his duties. Furthermore, even were MSLA performing activities in addition that those it performs on behalf of the Commissioner, then to the extent it is not performing functions on behalf of the Commissioner, it is not performing the duties that supported the levy of the examination fee in the first place. MLSA simply does not have free use of the examination fees to do with what it chooses. It bears repeating, the statute authorizes the Commissioner to approve the levy of an examination fee—which is the only fee at issue here—for the exclusive purpose of assisting the Commissioner in the performance of the Commissioner's statutory function.[5]

The fact, then, that MSLA can prove it is a private corporation avails it nothing in the present inquiry, for the State does not dispute that MSLA is a private entity, not a public body. Neither does the State deny that the examination fee is paid to MSLA by private entities; yet contrary to MSLA's insinuation, these are not simply membership dues. To be sure, the fee must be paid in order for a surplus lines agent to remain a member; but there is

---

4. It appears from MSLA's audits that the examination fee (and investment income from the surplus fees) are MSLA's only source of income.

5. MSLA asserts that its funds may be spent "in any manner consistent with its corporate charter." However, the statute controls use of the examination fees.

nothing voluntary about this arrangement from the perspective of the State, MSLA or the individual "members." As defendant notes, the Commissioner has mandated that every surplus lines agent must be a "member" of MSLA in order to write coverage in this state; it has authorized the collection of the examination fee from all members; and in the event a "member" fails to pay the examination fee, the State may bar such "member" from engaging in surplus lines business in Mississippi. *See* Miss.Code Ann. § 83–21–21(8) ("The association may revoke the membership of, and the Commissioner of Insurance may revoke the license in this state of, any licensee who fails to pay the examination fee when due, if the examination fee has been approved by the Commissioner of Insurance.").[6]

In *Great Lakes Higher Education Corp. v. Cavazos*, 911 F.2d 10 (7th Cir.1990), relied on by defendant, the court undertook to determine whether certain funds were appropriately characterized as public or private. There, the federal government subsidized student loans through the Guaranteed Student Loan Program (GSLP) and required state guarantee agencies to establish reserve funds to serve GSLP purposes. When some agencies amassed excess funds and used them for other purposes, Congress set reserve fund limits. The government thereafter directed Great Lakes, one of the guaranty agencies, to transfer its excess reserves to federal coffers, which prompted Great Lakes to sue the government, claiming an unconstitutional taking. The Seventh Circuit rejected Great Lakes' takings challenge, concluding that the excess reserves were public funds because "[f]ederal law regulates the reserve fund extensively and

it exists because of a federal mandate," and "its sources are substantially from the federal government and the uses to which it may be put are restricted [by government regulation] to paying default claims, refunding overpayments of insurance premiums, administering the guarantee program, and repaying advances made by the Secretary." *Id.* at 14. Elaborating, the court stated,

[T]he guarantee agency itself is heavily regulated by federal law. *Id.* § 682.400. The purpose and legal structure of Great Lakes places it in that borderline between the wholly public and wholly private instrumentality. The extensive federal regulation of the agency suggests its highly public nature. Although this characteristic does not absolutely preclude a successful constitutional challenge such as the one attempted here, it does suggest that any such attack requires precise identification of the "private" property at issue as well as a "taking" distinguishable from public regulation consistent with the purpose of the instrumentality.

Congress intended the GSLP to assist needy persons in their quest for advanced educational opportunities. H.R.Rep. No. 383, 99th Cong., 2d Sess. 4–8 (1985), reprinted in 1986 U.S.Code Cong. & Admin. News 2572, 2575–79. We find no indication that Congress meant for the reserve fund excesses to be irrevocably committed to the guarantee agencies. *Cf. Dayton–Goose Creek Ry. v. United States,* 263 U.S. 456, 484, 44 S.Ct. 169, 174, 68 L.Ed. 388 (1924) (rejecting Takings Clause challenge to statute permitting government recapture of excess funds collected by rail carriers above set rate of return because

---

**6.** Of course, membership is voluntary to the extent that a surplus lines agent could choose not to write coverage in Mississippi; but if it

makes a decision to write coverage in the state, its membership in MSLA is mandatory.

these funds were not private property). In essence Great Lakes is an intermediary between the United States and the lender of the student loan. The United States is the loan guarantor of last resort. Great Lakes assists the United States in performing that function. It cannot be compelled to perform that function, nor can it insist that its compensation for that service be irrevocably fixed. We, therefore, conclude that the reserve fund excess is not "private property" for purposes of the Fifth Amendment.

*Id.* at 14–15.

Defendant points out that here, as in *Great Lakes*, MSLA funds exist by legal mandate and are restricted in their use to MSLA's operations on behalf of the Commissioner, a distinctly governmental function. As such, MSLA does not enjoy "free use, enjoyment, and disposal" of the funds, 911 F.2d at 14, and thus cannot rightly claim them as its own.

While this seems clear to the court, MSLA contends that *Illinois Clean Energy Foundation v. Filan*, No. 03C7596, 2004 WL 1093711 (N.D. Ill. April 30, 2004), *aff'd*, 392 F.3d 934 (7th Cir.2004), and *Texas Catastrophe Property Insurance Association v. Morales*, 975 F.2d 1178 (5th Cir.1992), support a contrary conclusion. In the court's opinion, MSLA's reliance on these opinions is not well grounded.

In *Filan*, pursuant to an act of the Illinois legislature authorizing the creation of a foundation "for the purpose of providing financial support to public and private entities with the goal of improving energy efficiency and supporting environmental projects," Commonwealth Edison (ComEd) established the Illinois Clean Energy Community Foundation (ICECF), and transferred to ICECF's bank account $225 million ComEd had realized in profits on the sale of certain power plants. Subse-

quently, the legislature required that the ICECF's trustees contribute $125 million to the state treasury to assist with the repayment of general obligation bonds and assist in funding the state's environmental programs. ICECF resisted, and filed suit claiming this was an unconstitutional taking of its private property.

Looking to the *Great Lakes* factors to decide whether the funds were public or private, the court noted there was a dispute between ComEd and the state over whether ComEd had provided the $225 million endowment simply as a discretionary gift or whether it had been paid as consideration for a deal with the state. *Id.* at *5. A finding that the state had required ComEd to make the contribution would have weighed in favor of finding the funds public because the state would have created ICECF via contract with ComEd. *Id.* However, because the statute authorizing creation of ICECF did not require action or payment by ComEd, the court concluded that "ComEd-not the state-established and funded ICECF." *Id.* at *6.

*Filan* is clearly distinguishable from the case at bar. While ICECF, as a not-for-profit corporation, was subject to limitations as to the types of projects and programs on which it could use its funds, it was essentially self-governing, with substantial leeway in deciding how to spend its funds. Unlike MSLA, while ICECF's operations were of benefit to the public, ICECF was not created for the purpose of assisting a state agency in performing its governmental function. MSLA's sole purpose is to assist the Commissioner, and the examination fees may only be used for that singular purpose.

At issue in *Morales* was the constitutionality of a state statute which required the Texas Catastrophe Property Insurance Association (CATPOOL) to rely exclusively on the Texas Attorney General for legal

representation. CATPOOL contended the statute violated its constitutional right to counsel of its choice. The state's attorney general argued that CATPOOL was a state agency and therefore had no constitutional rights to assert against the state which created it. Thus the first relevant question in CATPOOL was "one of identity," namely, whether CATPOOL was a part of the state, because "if CATPOOL [was] part of the state, it [could not] make any constitutional claims against the state; the agency and the state would be one and the same thing." 975 F.2d at 1181–82.

CATPOOL was created by the Texas Legislature to provide windstorm and hail insurance to homes and business in the state's coastal counties, high risk areas in which insurance would otherwise have been unavailable or prohibitively expensive through the private insurance market. CATPOOL provided "a sort of assigned risk pool; all of the property insurers in Texas [were] required to belong to the pool as a condition of doing business in the state," *id.* at 1179, and were required to write coverage in those coastal counties. As the court explained, "CATPOOL writes its own policies and pays its own claims, which are funded first from premiums, then from assessments against the member companies." *Id.* In defining the relevant inquiry, the court quoted from *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 629–30, 4 L.Ed. 629 (1819), in which Chief Justice Marshall articulated this principle:

> If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds ... be public property, or if the state ..., as a government, be alone interested in its transactions, the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power

imposed by the constitution of the United States.

*Id.* at 1182. The court concluded that CATPOOL was not part of the state, for while the State created and regulated CATPOOL, CATPOOL's function was for the benefit of the public, and CATPOOL's profits and losses were its own:

> If CATPOOL makes a profit, that money does not go to the state. Although some profits are used to purchase reinsurance, the member companies may receive distributions from profits. Tex. Ins.Code Ann. art. 21.49, § 5(b) (West Supp.1992). If losses exceed premiums, the member companies are assessed, not the public treasury. *See id.* When CATPOOL loses, the bank accounts of its members are depleted, not the public treasury. The fact that losses are subsidized in part through the allowance of tax credits does not eliminate the risk to the private entities' capital. When CATPOOL wins, the bank accounts of its members may be augmented, not the public treasury. Hypothetically, if CATPOOL's lawyer is incompetent or disloyal, the members, who are private companies, lose money, not the public treasury.

> That the state holds, and exercises, the coercive power to force private insurers doing business in Texas to cover certain risks does not mean that the money coming out of the companies' bank accounts is state money. It is private money directed to pay private claims. Indeed, the amount of money paid on individual claims depends on its attorneys' successfully advancing their positions. The act creating CATPOOL is not "a grant of political power," as in the case of a municipality or other political subdivision; CATPOOL is not "employed in the administration of the government"; and the funds that will be

used if counsel is incompetent or disloyal come from the accounts of private companies, where that money could remain if it were protected by counsel. In short, the State of Texas is not alone interested in the assets of CATPOOL. *See Dartmouth College,* 17 U.S. (4 Wheat.) at 629–30. Rather, the member companies are vitally interested in protecting their private monies, and the State of Texas cannot deprive those companies of the rights guaranteed them by the Constitution of the United States to protect their private property. *Id.* at 1182–83.

While MSLA resembles CATPOOL in some respects, as, for example, in that both were subject to the states' coercive power to force private insurers doing business in the states to be members of the organization, and both functioned in the public interest, the differences in the two, most pertinently as to funding, are manifest. Here, unlike in *Morales,* the examination fees collected by MSLA are not "profits" to be used by MSLA however it sees fit. Rather, they are fees collected under the auspices of the state for the purpose of funding MSLA's operation on behalf of the state. The fees at issue here are not like the private monies at issue in *Morales.*[7]

In summary, the court concludes that the excess examination fees held by MSLA are not its private funds but rather are held on behalf of the State, and accordingly, may be claimed by the State without violence to any constitutionally protected interest of MSLA. The court therefore concludes that defendant's motion for summary judgment is well taken and is thus granted, and that MSLA's cross motion for summary judgment is denied.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

---

7. MSLA's reliance on the Mississippi Supreme Court's recent decision in *State of Mississippi and J.K. Stringer, Jr., in his Official Capacity as State Fiscal Officer, and Jim Hood, Attorney General of the State of Mississippi, ex rel. the State of Mississippi v. The Board of Levee Commissioners for the Yazoo–Mississippi Delta,* 932 So.2d 12 (Miss.2006), is similarly unavailing. The court's conclusion that surplus funds in the hands of the Levee Board could not be taken by legislative fiat was based on the constitutional (as opposed to legislative) nature of the Levee Board. The Levee Board argued that it was a constitutional entity, and that " '[w]hile ... the legislature possesses the power to take away by statute what has been given by statute, the same cannot be said for that created by the Constitution.' " *Id.* (quoting *Board of Trustees of State Institutions of Higher Learning v. Ray,* 809 So.2d 627, 637 (Miss.2002)). The court agreed with the Board that as the Board was a "constitutionally-created entity" rather than a "statutorily-created entity," the legislature's attempt to transfer Levee Board funds to the state treasury was unconstitutional.